Andrew J. SCOTT, Appellant,

v.

Victor G. WALKER, Warden of the Louisiana State Penitentiary, et al., Appellees.

No. 20814.

United States Court of Appeals
Fifth Circuit.

March 31, 1966.

Harris M. English, Baton Rouge, La., for appellant.

Thomas McFerrin, Asst. Atty. Gen., Teddy W. Airhart, Jr., Asst. Atty. Gen., Baton Rouge, La., Jack P. F. Gremillion, Atty. Gen., State of Louisiana, for appellees.

John Doar, Asst. Atty. Gen., David L. Norman, Albert S. Pergam, Attorneys, Department of Justice, Washington, D. C., amicus curiae, for the United States.

Before TUTTLE, Chief Judge, and BROWN, WISDOM, GEWIN, BELL, THORNBERRY, and COLEMAN, Circuit Judges.

TUTTLE, Chief Judge:

This is an appeal from the denial by the United States District Court for the Eastern District of Louisiana of appellant's petition for a writ of habeas cor-

pus, seeking to vacate the judgment and sentence under which he is now in custody awaiting the execution of the sentence of death by electrocution, following a verdict of guilt of aggravated rape by a jury of Livingston Parish, Louisiana. It is one of several cases heard by this Court en banc, because of the identity of the legal principles involved and because of the desirability of achieving uniformity in the handling of the substantial number of cases arising in this Circuit dealing with the same question of law. The appellant is a Negro man and the victim of the offense is a white woman.

At the time of his trial, the appellant filed a motion to quash the indictment and to quash the venire and, in addition, he filed a motion for change of venue on the ground of alleged local prejudice. The State trial court overruled the motions to quash the grand and petit juries upon a showing that one member of the Negro race was on the grand jury which indicted appellant and that another member of the Negro race was on the general venire list of 300 names from which was drawn the trial jury in Scott's case. However, the court permitted counsel for appellant to make some showing of the small number of Negro names on the general venire list in support of his motion for change of venue.[1] The trial court overruled all preliminary motions, and, following his trial and conviction, appellant appealed to the state Supreme Court, which affirmed the conviction, State v. Scott, 237 La. 71, 110 So.2d 530 cert. denied 361 U.S. 834, 80 S.Ct. 85, 4 L.Ed.2d 75.

An application was then made to the United States District Court for writ of habeas corpus. A hearing was had, directed solely to the question of systematic exclusion of Negroes from the petit jury. The findings and conclusions of the trial court are reported. United States, ex rel. Scott v. Walker, Warden, D.C., 218 F. Supp. 866. This order of the District Court is before us for review on appeal.

---

1. The evidence offered by appellant on the motion to quash in the state court was not as full or as detailed as was the evidence which he later submitted on the petition for habeas corpus in the Federal District Court.

Louisiana law prescribes the qualifications for jurors.[2] Appellant does not contend that the statute does not in all respects, prescribe proper standards. However, he particularly calls attention to the need for carefully scrutinizing the results of a jury system which permits selections of prospective veniremen by such completely subjective standards as "persons of well known good character and standing in the community."

Under the Louisiana statutes, a jury commission of five electors appointed by the District judge, together with the Clerk of the District Court, are required to "select from the persons qualified to serve as jurors" for the parish, 300 persons of whom a list shall be made and this list shall be the general venire list. This is done every six months. From this general venire list, the Commission is to select the names of 20 citizens from different portions of the parish for grand jury service. One of these is selected by the judge to be foreman of the grand jury; the remaining 19 are placed in an envelope marked "grand jury list;" 11 names are then taken by lot from the envelope and these, with the foreman, constitute the grand jury of the parish.[3] The remaining 280 names, together with the eight names from the grand jurors list, not selected to serve on the grand jury, are then put in the "General Venire Box." It is from this box that one of the Commissioners thereafter draws the names of the several 30-member jury panels that are used for the criminal and civil trials for the term of court. The

law also authorizes the drawing of additional jurors whenever the judge may so order for the trial of criminal cases. These, known as tales jurors, are selected in the same manner. Upon the trial of appellant, the names of 50 tales jurors were drawn in addition to the original list of 30.

We think it would be helpful, before discussing the facts in this case, to consider the significance in this area of constitutional law of the most recent case decided by the Supreme Court, Swain v. State of Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759. While the *Swain* case dealt primarily with an attack based upon the fact that no Negro had ever served on a criminal jury in Talledega County, Alabama, allegedly because of the fact that the State prosecuting officers used the preemptory challenge system to eliminate all Negroes, the case also considered the appellant's contention that the disproportion between the percentage of Negroes on the regular trial venires and the percentage of the Negroes resident and otherwise qualified in the county was sufficiently great to warrant the court's deciding, as a matter of law, that the state was pursuing a system of systematic exclusion. In view of the fact that this is the precise attack that is made here, it becomes necessary for us to consider the facts in the *Swain* case, since the Supreme Court rejected the contention made by the appellant there.

In the *Swain* case it appears that while Negro males over 21 constituted 26% of

---

2. The qualifications to serve as a grand juror or a petit juror in any of the courts of this state shall be as follows:

 To be a citizen of this state, not less than twenty-one years of age, a bona fide resident of the parish in and for which the court is holden, for one year next preceding such service, able to read and write the English language, not under interdiction or charged with any offense, or convicted at any time of any felony, provided that there shall be no distinction made on account of race, color or previous condition of servitude; and provided further, that the district judge shall have discretion to decide

upon the competency of jurors in particular cases where from physical infirmity or from relationship, or other causes, the person may be, in the opinion of the judge, incompetent to sit upon the trial of any particular case.

 In addition to the foregoing qualifications, jurors shall be persons of well known good character and standing in the community. LSA–R.S. 15:172

3. A granted jury of twelve, nine of whom shall constitute a quorum and must concur to find an indictment, shall be impaneled in each parish twice in each year. La.Const. Art. 7 § 42.

all males in the county in the age group, only ten to fifteen percent of the grand and petit jury panels drawn from the jury box since 1953 have been Negroes. In one case the percentage of Negroes on the panel was as high as 23%. During the same period of time Negroes served on 80% of the grand juries selected, the number ranging from 1 to 3. There were 4 or 5 Negroes on the grand jury panel of about 33 in the *Swain* case, and 2 of these served on the grand jury which indicted Swain. There had been an average of 6 to 7 Negroes on petit jury venires (apparently of 30 in number), but no Negro had actually served on the petit juries since about 1950. In the *Swain* case itself, there were 8 Negroes on the petit jury venire (presumably a venire of 50, since it was a capital case), but none actually served, 2 being exempt and 6 being struck by the prosecutor in the process of selecting the jury. Other significant facts in the *Swain* case are that the jury commissioners, with the clerk's assistance, selected the names of persons who in their judgment were qualified. The sources were city directories, registration lists, club and church lists, conversations with other persons in the community, both white and Negro, and personal and business acquaintances. The commissioners sought qualified names through local merchants and citizens, both Negro and white. On this state of facts the Court held, "We do not think that the burden of proof was carried by petitioner in this case." Three Justices dissented, and would have reversed the conviction based on this state of facts.

The Supreme Court, in the *Swain* case, did not establish new underlying principles or in any way reverse or overrule earlier decisions of the Court. In fact, the Court quoted the following language from Carter v. State of Texas, 177 U.S. 442, 20 S.Ct. 687, 44 L.Ed. 839:

"Whenever by any action of a state, whether through its legislature, through its courts, or through its executive or administrative officers, all persons of the African race are excluded, solely because of their race or color, from serving as grand jurors in the criminal prosecution of a person of the African race, the equal protection of the laws is denied * * * *."

The Court also quoted from Smith v. State of Texas, 311 U.S. 128, 130, 61 S.Ct. 164, 85 L.Ed. 84:

"For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violated our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government."

■ The sentence immediately preceding this last quotation from Smith v. State of Texas, while not quoted in the majority opinion is, we think, still a part of the jurisprudence in this difficult area:

"It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community."

■ In view of the fact that the above language was quoted by the Supreme Court in a petit jury case rather than a grand jury case, and since, also, it was quoted in a case which did not involve total exclusion but involved the question of systematic limitation or systematic token inclusion by race, we think there can be no doubt but that the principles announced are those which must be applied by us in this case.

It should be made clear exactly what the record before us discloses, without dispute, and as to which the trial court made no contrary finding of fact. We start with the fact that no Negro has served on a criminal petit jury in Livingston Parish. The second fact is that there was no Negro on the venire of 30, and there was no Negro on the tales list of 50 additional names used for the trial. Next is the fact, as found by the trial court, that the testimony of the court clerk, who was the ex officio member of the jury commission, showed "that his examination of the 300 names contained on the general venire showed, as far as he

could determine from his own personal knowledge, the name of only one Negro."

The next was the testimony of Judge Fannie Burch, one of two district judges during the five year period which was fixed by the trial court as the period for which appellant's counsel could undertake to prove his contention of systematic exclusion. Judge Burch presided over one half of the criminal terms of court during her service. She testified that she heard many criminal cases and she testified that during her service there had never been a Negro who actually served on a criminal jury during the trial of a case. She further testified: "My recollection is that I never had a petit jury that included a Negro on it, but I do recall that there have been *one* or *two* that had been called to the panel on the venire list." (Emphasis added). She also testified that in *one* civil trial a Negro had been accepted by both sides and had actually sat on the jury during her tenure of six years. She commented that the reason she remembered this was that this was the first time she was aware of any Negro actually sitting in a jury box and she was concerned lest it cause trouble, which, however, it did not. Judge Burch also testified that no Negro served on any grand jury selected while she was presiding.

Either stipulated or undisputed facts favoring the state's position were: One Negro served on the grand jury which indicted appellant; one or two Negroes were selected by the commissioners for the grand jury *list* at nearly every drawing, and at least one other Negro actually served as a grand juror during the period in question.[4]

The foregoing facts were all developed on behalf of the petitioner in the United States District Court. Some of it came on the examination of Alsay Addison, the Clerk of the District Court, an ex officio member of the jury commission.[5] To the extent that Mr. Addison's testimony might be claimed to weaken the effect of the undisputed facts, we think it should be considered here. First, though, there is his testimony, already referred to by the court below, to the effect that he recognized only one Negro's name on the general venire list. In response to a subpoena duces tecum, he had this list in court. After testifying that there were no Negroes on the trial panel or the tales list (totalling 80 altogether), Mr. Addison was asked:

"Can you testify as to whether or not there were any Negroes in that entire jury box from which those eight names were drawn?"

He answered:

"I can look on the three hundred general venire and tell you."

The following then transpired:

"Question by the Court. Do you have the list of 300 from the general venire list?

Answer: Yes, sir.

Question: Would you inspect that then and see whether or not there are Negroes included in the general venire list of 300 names?

(Mr. Airhart, counsel for the State)

Can we have about a 3 minutes recess while he goes over that list?

The Court:

I was going to recess as soon as we get through, I was going to recess for lunch because it is a quarter til twelve.

4. The testimony is not clear when dealing with the placing of the names of Negroes "on the grand jury." One of the commissioners testified that he nearly always placed a Negro's name on the grand jury. This of course, would be impossible under the law because all he could do was to place the name on the list of 20, which would then go into the envelope with 18 other names and might or might not be drawn for actual grand jury service when the 11 names were drawn by lot.

5. Although Mr. Addison stated that he did not personally select any names, the law requires that he be present at all meetings of the commission. The law does not distinguish between him and the other members so far as selection of jurors is concerned. He was the clerk or secretary of the commission.

The Witness:

Yes, sir, I recognize a Negro in this venire.

The Court:

Who is it? What is the name of that person and what ward is he from?

Mr. English (counsel for the petitioner):

What was the answer to that Mr. Addison?

The Witness:

I recognize a Negro on the general venire.

Question: How many?

Answer: One.

Question: Who is he and what ward is he from? Name, please.

Answer: From Ward 4, Lucius Jackson.

Question: That is the general venire, in the jury box from which the 80 names were selected.

Answer: Yes, sir.

Question: There was only one in the entire box of 300?

Answer: That is the only one that I recognize.

Question: And you were sure that is the general venire list for the term of court March 1958?

Answer: It sure is."

Thereafter Mr. Addison testified that during the five year period there would be a total of 3,000 names on the jury list, since there were 2 lists of 300 prepared each year. Thereupon, the following questions and answers took place: (Italics supplied).

"Question: Well now what percentage or what number of Negroes were put in there during that time?

Answer: That I wouldn't know. I couldn't say.

Question: You couldn't give us some kind of a rough estimate?

Answer: No sir, I don't known. That is something I don't know.

Question: Can you or can you not, under your oath, Mr. Addison, testify that there were any Negroes beside that one?

Answer: Well, I would say that there were some more because there always have been.

Question: Now wait now.

Answer: I couldn't pick them out. You asked me could I pick them out. I picked out the *one* but I know there was more in there but I don't know the names. That is the truth."

He later said, "There have been quite a few on there, sure. In five years I have seen several of them coming to court."

Then the following transpired:

"Question: Can you name any of them?

Answer: No, I can't. I can name *one* that I have seen up there, yes sir.

Question: You named one and he would be included, that is the one?

Answer: Yes, sir.

Question: Lucius Jackson?

Answer: I can give you others that have been there in five years, yes.

Question: Well, now, was there a whole lot of them?

Answer: There have been quite a few.

Question: What do you mean by that?

Answer: Well, what do you mean by a 'lot of them'?

Question: Well, now, you know what a token number is?

Answer: Yes.

Question: Well, now, was it a token number?

Answer: Yes, I think it was a token number there.

Question: How much of a token number?

Answer: That I wouldn't say. I never did pay too much attention to actually know who all comes and who didn't."

Following this exchange, the court inquired of the witness as to whether he understood what the word "token" meant. We conclude that the trial court correctly decided that Mr. Addison did not intend

to use the word "token" in its correct sense of a nominal number. This passage finally concluded with this testimony by Mr. Addison:

"Answer: How many, I don't know any particular number, how much was put at any time. There has always been quite a few in there.

Question: Now what do you call quite a few, Mr. Addison?

Answer: I wouldn't want to pick out any particular number because I would not know. I know there has always been *a* Negro in it.

Question: *Negro or Negroes, what did you say?* I didn't understand.

Answer: *I didn't say any number.*

Again, in response to another question,

"And you don't know, and you can't give us any other one Negro beside Lucius Jackson, the one Negro that you say you recognize, in all of those general venires, or can you?

"Answer: I can give you what I recognize from it of the Negroes.

Question: And that is the one?

Answer: I recognize him that particular one."

At the conclusion of his testimony Mr. Addison was asked the following question by the court:

"Are you aware of or do you know of any discussions, any plans, any programs or any systems that were used by the responsible officials in Livingston Parish between the years 1953 and 1958 for the purpose of excluding or making sure that Negroes did not serve on criminal juries? Now, you are under oath and I want you to answer that question: Do you know of your own knowledge of any such plans, programs, discussions, or systems that were used by officials of Livingston Parish to make sure that Negroes did not serve on criminal juries?"

"Answer: No, I don't know of any such, your Honor."

Undisputed statistical figures show that in 1960, 2 years after appellant's trial, the total population of Livingston Parish was 26,974, of whom 4,028, or 14.9% were Negro. Of the population over the age of 21 residing in the Parish in 1960, 14,124 were white and 1818 were Negro, approximately a ratio of 13% Negro to white. In 1956, two years before the trial, 10,068 white persons were registered to vote and 1252 Negroes were registered. There seems to have been a re-registration, or a deep purge in registration figures in 1957, for in that year 4,011 white persons and 387 Negroes were registered. In 1958, 6632 whites and 575 Negroes were registered, and in 1959, the lists had gone back to approximately the same proportions as in 1956, with 10,995 white and 1050 Negroes registered.[6]

The record discloses that appellant's counsel had some difficulty in having access to the official records prior to the date of trial. An investigator hired on behalf of the petitioner testified that he had requested access to the general venire list of 300, but that this had been denied him. In the state court proceedings counsel sought to have access to the list of names in the then current jury box, which was to supply the panel before whom Scott was to be tried, but the trial court held that he could not legally make this list available. In any event, on the day of the hearing before the habeas corpus court Mr. Addison had before him the general venire list of 300 for the term of court during which appellant was tried,

---

**6.** The significance of the registration figures will be seen when the testimony of the commissioners is later discussed in view of the fact that the Louisiana requirements for registering to vote were about as demanding as those of any state in the union at the time of these figures. See Louisiana Constitution, Art. 8, Sec. 1, and Louisiana Rev. Statutes 18:35.

These requirements were later refined and made more difficult and were subsequently held to be invalid when applied in a discriminatory manner in certain Louisiana parishes. See United States v. State of Louisiana, D.C., 225 F.Supp. 353, aff. 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed. 2d 709.

and out of which the petit and tales jurors were drawn.

■ Upon the basis of the facts here outlined, appellant rested his case, contending that he had made a prima facie case and that the burden was on the state to prove that the system employed did not amount to systematic exclusion or systematic token inclusion of the names of Negroes for petit jury service. We agree that the case thus made out clearly placed such burden on the respondent to account for the great disparity between the percentage of Negroes in the parish and having at least the qualifications to be registered voters and the percentage of Negroes shown to have been included on the general venires, both for the current term and for the previous several years. See United States ex rel. Seals v. Wiman, 5 Cir., 304 F.2d 53. Cf. Swain v. Wood, supra.

In order to rebut the inference that would necessarily have to be drawn from the facts as presented on behalf of petitioner, the respondent called three of the five commissioners. Most significant is the fact that the respondent did not produce any of the lists for the previous four years in an effort to show the racial composition. Moreover, it cannot be said that the respondent was not aware of the relevance and materiality of this information, for the subpoena issued to Mr. Addison, requested that he be "prepared to testify as to whether the persons on these jury box rolls or lists of names were members of the white or Caucasian race or members of the Negro or colored race."

Circumstances bearing on the availability of factual information of importance here was the testimony that in making up the jury lists the commissioners primarily used a list of registered voters and that this list was compiled from cards which indicated the race of the voter.

The trial court found that Mr. Addison's "testimony shows that the voter registration rolls are used as a primary reference, but that the jury commissioners have the right to, and do frequently use other sources from which to get names of prospective jurors. The jury commissioners are supplied with a complete list of the registered voters, taken from the voter registration cards in the office of the registrar of voters. While the registration cards themselves do indicate whether the person named thereon is white or colored, nevertheless the typed list taken from these cards and furnished to the jury commissioners for their use in selecting jury panels does not contain any reference to the race or color of the persons listed thereon." Thus, it would be possible to ascertain the race of a substantial number of the names on any general venire list of 300 by checking against the original registration cards which are on file at the courthouse.

Thus it is that, instead of producing the lists with witnesses who could state the race of persons listed on each of them for the period in question, which would have proven without any doubt, if it had been true, that there were more than a token number of Negroes listed, respondent depended on oral testimony of the three commissioners. Although each of these commissioners testified that he only chose persons to serve on the jury whom he knew personally, not one of them identified a single Negro as having been placed by him on the general venire list during the five year period. Not one of them testified even as to an estimate of the number of Negroes whose names appeared on the general venire list or the percentage of Negroes to whites, and they testified as to their own participation in the jury selection system in only the vaguest terms, i. e., "one to three," "several," "quite a few."

The first official witness was Mr. Clifton C. Threeton. After testifying that he had been jury commissioner from 1954 down through the time of the trial, he testified that his method of selecting names to put on the jury list was that *he would pick only people whom he knew:* "I just would not take the name that was on a list if I didn't know who the man was, that he had never been convicted of a crime, and that the man could read and

write and was just a good citizen, regardless of race, creed or color; that had nothing to do with it."[7] He testified that during the time he served as a jury commissioner he submitted names of colored persons to serve as jurors and that there was no attempt on his part to exclude a juror because of race. Then the following transpired:

"You have to know him to do that. I would be foolish to pick a person, a man at random, and put him on there.

"Question: Then you know how many Negroes you put on?

Answer: No, I don't know the number, at different times how many, because I didn't keep a record of the colored people. I made up my list, whatever it consisted of it didn't make any difference. * * *

\* \* \* \* \* \*

Answer: I will tell you now about the number. I couldn't tell you how many white ones I put in.

Question: I want to know how many Negroes.

Answer: I don't know. but I am sure there was *some* on there.

Question: You say some, now some, one?

Answer: No, there was *more than one*.

Question: You know it was more than one?

Answer: But I could not tell you how many in numbers."

Further, on cross examination the following questions and answers were given:

"Question: Then, do you know whether or not the venire list, as well as the tales list drawn for the trial of Scott, this Negro, had any Negroes on it?

Answer: I am *reasonably* sure it did. *Under oath I wouldn't say I know it had some*, but I am reasonably sure it did.[8] I had some names submitted, myself, but at this time I couldn't tell you whether they were on the *petit jury, grand jury*, or what.

\* \* \* \* \* \*

Answer: I am *reasonably* sure that I had *one or two* in myself, I couldn't tell you about the other commissioners."

Still pounding away at the witness, counsel for appellant said,

"What about it, were there any Negroes?

"Answer: I am *reasonably* sure there were. That was my statement before. If you go look it up. * * * *I would not under oath say yes or no*.

Question: If you know—if there were any on it and you knew it you would know who they were?

Answer: No, I would not recall that, being three years ago. I didn't keep a list after I submitted them, turned them into the box, I didn't keep a list of the names."

James S. Barnett served as jury commissioner during the entire time of Judge Fannie Burch's tenure. He testified that there was no time when he helped to make up a jury list that he personally didn't put in "from one to three Negro names into the box." He represented the Second and Eleventh Wards. The following testimony was then given:

"Question: What was the number in there? That is what I am trying to get someone to tell us, to testify to. What number was put into the general venire jury box?

Answer: Well, I usually put *one* man on the grand jury.

7. Thus, it appears that Mr. Threeton was picking the names of persons he knew personally from the voters registration list and although the voting requirements eliminated all those who had been convicted of a crime and who couldn't read and write, he seems to have assigned the lack of these qualifications as the cause of the small number of Negroes chosen by him for jury service. Sixteen per cent of his wards were Negroes.

8. It had previously been testified by the Clerk that there were no Negroes' names on either of these lists, so it is apparent that Mr. Threeton was talking about the list of 300 or that he was mistaken.

Question: How did you do that?

\* \* \* \* \* \*

Answer: Well, I would take \* \* \* You see the grand jury in the Parish, there were 20, 20 names for the grand jury, and I would usually put one out of each Ward that I represented.

\* \* \* \* \* \*

Answer: I said I would submit two names, one from each Ward for the grand jury, and the others would go into the venire box.

Question: Then you jury commissioners did draw and put the grand jury separate from the petit jury venire?

Answer: We did that, yes.

Question: Then you would put the Negroes on the grand jury venire and you didn't necessarily have to have them on the petit jury, did you?

Answer: We put them there. We put them in the box. Now, whether they were drawn out I didn't stay to see. I didn't know. I was there one time when all were drawn out but I didn't pay attention whether they were Negro or white people.

Question: But definitely there were Negroes drawn out for the grand jury?

Answer: Petit jury too.

\* \* \* \* \* \*

Question: And you saw to it, to be fair, you saw to it that there were some Negroes, at least one or two—you said one time three, is that not correct?

Answer: It would be, I said, *one* to *three*, at each jury drawing, went in that petit jury box."

Barnett later reiterated that he, as one commissioner, "always put *one* to *three* Negroes' names on the petit jury list." He testified that he took all of his names from the list of registered voters. The Negro population of his wards represented 15.8% of the total.

The final official witness was Louis F. Harris who submitted names as jury commissioner from the Seventh and Third Wards. On direct examination he merely testified that he did not know of or participate in any plan for the exclusion of Negroes on account of race. He testified that during his period of service he put the names of *no* Negroes in for the list of 300. He testified that he did not know how many Negroes were on any of the lists that were submitted during his term of office.

In addition to these official witnesses, appellee stated that Mr. Easterly, a member of the commission, was deceased and Mr. Picou could not be found. But the testimony given by Picou on the trial in the state court on the motion for change of venue was tendered in evidence. His testimony can be summarized briefly. After stating that he was from the Fifth Ward and selected names for the Fifth, Sixth and Tenth Wards, the following transpired:

"Question: Do you have any Negro residents of that Ward?

Answer: Yes.

Question: A great number?

Answer: No.[9]

Question: Did you put any of those names in the jury box?

Answer: Yes sir, *at times*.

Question: How many?

Answer: *Unknown.*

Question: That is unknown?

Answer: That is right.

Question: Was that just a token number?

Answer: No, one token number.

Question: Could you give us an idea about what number?

Answer: *It's unknown.*"

---

9. In point of fact much the largest percentage of Negroes to total population

lived in Picou's wards. They constituted 23.1% of the total population.

On cross examination, Picou testified as follows:

"Question: Since you have been on the commission, isn't it the fact that you have *on several occasions* submitted the names of Negroes from your section of the Parish?

Answer: That's right.

Question: And isn't it a fact some of *those Negroes* have served on *grand juries* and other juries?

Answer: That's right.

Question: Have you as a jury commissioner made a systematic exclusion of Negroes from the jury list?

Answer: No, never did.

\* \* \* \* \* \*

Question: On *several* occasions, have you not submitted the names of Negroes from the Tenth ward, from the Fifth and from the Sixth wards?

Answer: That's right."

 There are several principles of law that are now clear in this difficult area. The first is that the systematic exclusion of Negroes from juries in judicial districts where Negroes represent a substantial part of the population constitutes a deprivation of equal protection under the Fourteenth Amendment. Patton v. State of Mississippi, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76, where the Supreme Court said, "When a jury selection plan, whatever it is, operates in such way as always to result in the complete and long-continued exclusion of any representative at all from a large group of negroes, or any other racial group, indictments and verdicts returned against them by juries thus selected cannot stand." 332 U.S. 463, 469, 68 S.Ct. 184, 187. The second proposition which is equally clear is that the inclusion of a minimal or token number of Negroes on a jury list does not prevent the systematic exclusion rule from operating, for the Supreme Court has said in Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469: "Of course, token summoning of Negroes for jury service does not comply with equal protection, Smith v. [State of] Texas, 311 U.S. 128 [61 S.Ct. 164, 85 L.Ed. 84]." See also United States ex rel. Willie Seals, Jr. v. Wiman, 5 Cir., 304 F.2d 53, 67. A further proposition, not in dispute, is that the Constitution does not require an exact proportion between the percentage of Negroes in the population and the percentage of Negroes on the jury lists, nor does the Constitution require that any particular panel of jurors in a criminal trial include members of the race of the accused person. Swain v. State of Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759. Finally, it is also clear that there is a burden of proof upon the petitioner in a habeas corpus proceeding to establish sufficient facts to warrant a finding of denial of his constitutional rights. Swain v. State of Alabama, supra.

██ A careful reading of the record in this case leaves us with the clear and definite impression that, although the proof was difficult to elicit, coming, as it must principally, from officials whose official conduct is being challenged, there had been during the five years preceding the trial of the accused, the period of time allowed by the district court for pertinent testimony, "a jury selection plan," that "operate[d]" in such a way as always to result in there being a "token summoning of Negroes for jury service." Cf. Brown v. Allen, 344 U.S. 443, 471, 73 S.Ct. 397, 415. With a jury list of 300 (288 after the grand jury is sworn), it is apparent that unless there were as many as three Negroes on a list there would be less than one percent of the list who belonged to the race of the accused. It is impossible to read the evidence in this case and not conclude that the testimony of the witnesses clearly demonstrated that three or four is the maximum number of veniremen of the Negro race who had regularly been placed in a general venire "box" from which all trial juries were drawn.

We need not question the veracity of a single witness, nor need we overturn a single holding of evidentiary fact by the trial court to conclude that the testimony taken most strongly in favor of the appel-

lee, although noticeably avoiding reference to precise numbers, demonstrated that the number of Negroes on any of the twelve semi-annual jury lists did not exceed a token number.

We begin with the venire of the session of court at which appellant was tried and convicted. After the clerk of the court, ex officio clerk of the commission, stated that he could "tell" if there were any Negro names on the list, he testified that there was only one that he could recognize there. In light of other testimony, we accept this as being evidence that there was only one Negro on that list. This is entirely consistent with the other facts testified to. It is entirely consistent with testimony by others that "several" or from "one to three" were included in each box. It is entirely consistent with the testimony of Judge Fannie Burch who testified that *during the six years* she was on the Court she had observed *one* or *two* Negroes called up for jury duty on regularly impaneled venires. It is wholly consistent with the testimony of Messrs. Threeton and Barnett as to the placing of Negroes on grand juries. It is even consistent with the general testimony that *over the period of five years* there were "quite a number" of Negroes on the lists.

There is one aspect of the opinion of the trial court which indicates that the court was clearly misled by counsel for the respondent, dealing with the manner in which the grand jury is chosen. Counsel sought to question a witness as to whether it was not true that Negroes frequently sat on the grand jury. The trial court questioned the relevance of this question in light of the fact that the composition of the grand jury was not in issue. Counsel responded by saying, "Title 15 § 178 [probably meaning § 180] of the Louisiana Revised Statutes sets forth the procedure in which the names for the grand jury and the petit jury are made or are drawn from, and the manner in which it shall be done, and, with that in mind, that the court may take judicial notice of the state statutes with reference thereto, then I ask the question because

*the grand jury is taken from the same box as is the general venire list."*

Bearing in mind, as has been stated initially, that the statute provides that the commissioners select, not by lot, but by knowing whom they wish to choose, 20 persons to be put on the grand jury list *before any names are put into a box,* this response is clearly erroneous. The fact of the matter is, it is entirely possible, although not proved in this case in spite of efforts made by counsel for the appellant to argue it here, for the commissioners to take a list consisting of 300 names which might have on it two or three or even more Negro names, place all of the Negro names along with the white names among the 20 chosen for the grand jury list and thus leave no Negro names to be placed in the jury box subject to the hazard of blindfold drawing which is the process used for selecting venires for the actual trial of cases. It is apparent that this misled the trial court because the opinion below commented, in connection with Judge Burch's testimony, "She further testified to the system of choosing the jury venire in criminal cases is the same as in civil cases, and that both civil and criminal petit juries *and grand juries* are selected from the same lists and *the names are all drawn out of the same box.* Thus, it is obvious that if Negroes' names are included in civil jury venires and if they do in fact serve on civil juries *and on grand juries* as is clearly established by all of the evidence in this case, *their names are available* and subject to being selected *for petit jury* service in criminal cases also. (Emphasis added).

This error is of considerable magnitude, for two reasons. If, in fact, several Negroes' names were chosen for each grand jury consisting of a list of 20 names and if these names were picked out of a box of 300 *by lot,* as the trial court thought was done, then it clearly raised the question as to why there would not be many more Negroes' names in the box if as many as two or three should be chosen by a selection of only 20 by lot.

In the second place, it is significant, because, in the light of the testimony of all of the witnesses referred to above indicating a minimal number of Negroes' names on the total list of 300, the skimming off of even one or two for grand jury service, done as a conscious act, and not by lot, might well, as it seems to have done here, cut the total number of Negroes left to go into the box by one-third or one-half, thus reducing greatly the percentage of likelihood of a Negro's name being drawn for a venire of 30 for an actual trial.

In this connection we note one further error in fact stated by the trial court in its opinion in dealing with the testimony of Mr. Louis F. Harris, Jr. The court said, "He had submitted no names of Negroes because in his entire district there were only three Negroes, two of whom were women, and one of whom was too old to serve as a juror." The fact is that Mr. Harris' testimony about the three Negroes was that there were only three Negroes *on the registered voters list for his district. He did not testify* as to how many Negroes were *resident* there. Actually 5.6 percent of the population of his wards was Negro. This demonstrates that he restricted his selections to the voters list, and there being no eligible Negroes' names on the list he made no effort to canvass the others for jury eligibility.

█ We think that the trial court's misapprehension as to the fact of the grand jury drawings would of itself, in this capital case, warrant a reversal to permit the trial court to make a determination based on the true facts. However, we think it unnecessary to remand the case for further consideration by the trial court in light of the fact that the state by its own witnesses had contributed to the clear impression which we now hold that there could not conceivably have been more than one percent of the usual jury list of the Negro race. In light of the disparity between this and the 13 percent of the Negro population of the Parish, there was a strong presumption that there was a systematic exclusion within

the legal understanding of these terms. Thus the burden was on the state to produce such evidence as was available to it by taking the jury lists and making proof as to the racial identity of the members. Instead, it will be noted that in the direct examination of each of the members of the commission who testified on behalf of the state, no one of them was asked by the attorney for the appellee how many or what percent of the members of any of the lists were members of the Negro race. The state's efforts consisted almost solely in obtaining the conclusionary response to the question whether the commissioners participated in any plan or scheme to exclude Negroes on account of race. These answers could honestly be given by persons who had, nevertheless, by their conduct produced the result, even through no illegal or evil motive or absence of good faith, that the Constitution outlaws. See United States ex rel. Seals v. Wiman, supra, 304 F.2d page 65.

While it may be unfortunate that there is no proof in this record as to precisely how many Negroes were listed on the list of 300 for each of the years in question, since this would make much simpler the problem of a court's passing on the question of "tokenism," we think the evidence here adduced makes it clear beyond doubt that the number of Negroes' names listed regularly in making up the 12 lists which were subject to inquiry was so small that it is not necessary that the exact percentages be known. When given ample opportunity to make an estimate of numbers or percentages, no commissioner testified to any number that would bring the number of Negroes, when the contributions made by each of the commissioners were added together, to more than one percent on the average for the five years in question.

█ It is plain from the record here that the commissioners put on the list only those personally known to them. They made no especial effort to ascertain whether there were qualified Negroes in the parish for jury service. In failing to do so they violated the rule announced by the Supreme Court through Mr. Jus-

**574**

tice Reed in Cassell v. State of Texas, where it was said, "When the commissioners were appointed as judicial administrative officials, it was their duty to familiarize themselves fairly with the qualifications of the eligible jurors of the county without regard to race and color. They did not do so here, and the result has been racial discrimination." 339 U.S. 282, at 289, 70 S.Ct. 629, 633, 94 L.Ed. 839.

As we have noted, the trial court considered only the challenge to the racial composition of the petit jury, concluding on the basis of the hearing and decision of the state trial court that the presence of Negroes on some of the grand jury panels, including the one which indicted Scott, eliminated that issue, that there was no substance to the challenge to the grand jury on account of race. We think it far from clear, from the testimony adduced on this hearing, that the method of selection of the grand jury in Livingston Parish would meet the standards adopted by both this Court and the Supreme Court. This matter not having been considered by the trial court should not now be decided by us. However, since the conviction of the appellant must be set aside because of the systematic exclusion of members of the Negro race on the petit jury list, we think it appropriate to call this serious question to the attention of the respondent so that the state can consider whether the jury system in Livingston Parish, as touching the grand jury selection, is such as to meet constitutional standards before placing appellant on trial again before a legally constituted jury on the indictment heretofore returned by the grand jury which has been made the subject of attack in this case and in the state court.

The judgment of the trial court is reversed and the case is remanded with directions to issue the writ releasing the appellant from custody on his present conviction and sentence, subject, of course, to retrial by the state. See United States ex rel. Seals v. Wiman, 5 Cir., 304 F.2d 53, 69.

Reversed and remanded.