**Edward DAVIS, Appellant,**

v.

**The Honorable James H. DAVIS, Governor of the State of Louisiana, et al., Appellees.**

**No. 21976.**

United States Court of Appeals
Fifth Circuit.

May 31, 1966.

Bruce C. Waltzer, Adolph J. Levy, New Orleans, La., for appellant.

Jack P. F. Gremillion, Atty. Gen. of Louisiana, Teddy W. Airhart, Jr., Asst. Atty. Gen., Baton Rouge, La., Bertrand DeBlanc, Dist. Atty., Fifteenth Judicial District of Louisiana, for appellees.

John Doar, Asst. Atty. Gen., David L. Norman, Alan G. Marer, Attys., Dept. of Justice, Washington, D. C., for the United States as amicus curiæ.

Before TUTTLE, Chief Judge, and BROWN, WISDOM, GEWIN, BELL, THORNBERRY and COLEMAN, Circuit Judges.

THORNBERRY, Circuit Judge:

This is an appeal from the United States District Court for the Eastern District of Louisiana, where appellant's petition for writ of habeas corpus was denied after a hearing. The case was heard by this Court en banc, together with several other cases, because all of the cases contained the common issue of alleged discrimination in the selection of grand and/or petit juries.[1]

In the early morning hours of May 4, 1959, appellant, a Negro, was arrested by State authorities for the murder on the previous evening of a white police officer in the City of Crowley, Louisiana. A confession was obtained from appellant on the day of his arrest. Appellant was subsequently indicted by an Acadia Parish grand jury for murder in the first degree, and was tried, convicted and sentenced to be executed. His conviction

and sentence were affirmed on appeal by the Supreme Court of Louisiana. State of Louisiana v. Davis, 1961, 241 La. 974, 132 So.2d 866.

Appellant's first application for a writ of habeas corpus was denied by the 20th Judicial District Court of the Parish of West Feliciana on August 30, 1963. He then asked the Supreme Court of Louisiana to issue the writ, but his request was denied on September 4, 1963. State ex rel. Davis v. Davis, 1963, 244 La. 1008, 156 So.2d 222. On the following day application was made to the United States District Court for writ of habeas corpus. The questions presented to the District Court and which are before this Court on appeal are the following: (1) Whether there was a systematic exclusion or a token systematic inclusion of Negroes in the selection of grand and petit juries; and (2) whether appellant's confession was taken under circumstances which rendered it involuntary or which otherwise constituted a deprivation of appellant's constitutional rights.

Both of the above questions were decided adversely to appellant below. Each will be considered separately in this opinion.

## I.

### Discrimination in the Selection of Grand and Petit Juries

The applicable Louisiana law governing the qualifications for and the selection of grand and petit jurors is discussed fully in the case of Scott v. Walker, 5th Cir. 1966, 358 F.2d 561 (also considered by this Court en banc), and will not be repeated here in detail. Briefly summarized, the method of selecting grand and petit jurors is as follows: Five jury commissioners are required to select 300 persons from the parish who are qualified to serve as jurors. A list of these 300 names (known as the "general venire list") is then made by the clerk of the district court.[2] From the

---

1. The other cases considered en banc by the Court are as follows: Rabinowitz v. United States, No. 21256; Jackson v. United States, No. 21345; Scott v. Walker, 5 Cir., 358 F.2d 561; Billingsley v.

Clayton, 5 Cir., 359 F.2d 13; Brooks v. Beto, No. 22809; and Labat v. Bennett, No. 22218.

2. LSA-R.S. 15:179.

general venire list, the jury commissioners select the names of 20 citizens from different portions of the parish, "who shall be subject to duty as grand jurors during the term of six months after the grand jury is impaneled and until a succeeding grand jury shall have been impaneled." The names of the persons so selected are placed in a sealed envelope upon which is written the words, "List of Grand Jurors." [3] After the selection of the list of grand jurors, the commission then draws one or more panels of thirty persons from the remaining names in the "general venire box." These panels of thirty are used in the selection of petit juries in the parish.[4] Louisiana law also provides for the supplementing of the original general venire list at six-month intervals, to replace those persons on the original list who have served, have died or become exempt or disqualified, or who have moved from the parish.[5]

We shall consider first appellant's contention that Negroes were systematically excluded from petit jury service. The evidence with regard to the jury selection process in this case dealt only with the years 1958 and 1959. While the record does not contain a list of the names making up the original general venire list, it does show that during these two years there were four supplemental venire lists compiled (containing a total of 502 names). From the general venire list, as supplemented by the four supplemental venire lists, eleven thirty-member petit jury panels were drawn (330 persons).

According to the 1960 Census, Negroes comprised approximately 20% of the total population of Acadia Parish, Louisiana, Negro males represented about 20% of the total male population in the parish, and Negro males of age 21 and over made up about 16% of all males in Acadia Parish in that age group.[6]

Although these data show that Negroes were an identifiable group in Acadia Parish, the five jury commissioners were unable to find a single Negro on any of the eleven petit jury lists of thirty persons each. Furthermore, of the 502 names submitted over the two-year period by the commissioners to supplement the general venire list, the commissioners were able to identify only nine Negroes, or less than 1.8%.

Thus, we are faced with a significant discrepancy between the proportion of Negroes in the parish and the number of Negroes subject to selection from the general venire lists as petit jurors. The record contains more, however, than this discrepancy in percentages; it contains admissions by several of the jury commissioners which establish that the most probable reason for the discrepancy was a constitutionally defective method of selecting prospective jurors by the commissioners.

For example, Commissioner Johnson (in charge of the first ward, which is 25% Negro) admitted that he did not know many Negroes and that there were "a lot" of Negroes who were probably qualified for jury service whom he did not know, but "I don't go check them to see." He also stated that he knew only about 5% of the Negroes in his ward. Likewise, Commissioner Myers stated that he knew very few Negroes in his ward living outside his own town. Commissioner Daigle (in charge of the second and third wards, which are 20% Negro) testified that he used voter registration records primarily in picking names to be submitted for jury service. He further testified that almost all Negroes in his wards are qualified to vote and are regis-

3. LSA–R.S. 15:180.

4. LSA–R.S. 15:181.

5. LSA–R.S. 15:188.

6. See United States Census of Population for 1960, Vol. 1, Characteristics of the Population, Part 20, Louisiana, Tables 25, 27 and 28. According to the data in these tables, there were 9,817 Negroes in a total population of 49,931; there were 4,701 Negro males in a total male population of 24,595; and there were 2,109 "nonwhite males of age 21 and over in the total male population of 21 and over of 12,934. Other than Negroes, there were only 3 nonwhite males in Acadia Parish. (Table 28)

tered voters. Yet, out of a total of 117 names submitted by Commissioner Daigle for the four supplemental venire lists, he was able to identify only one name as that of a Negro person.

While the courts have repeatedly held that no defendant is entitled to a proportionate number of his race or class on the particular petit jury that tries him, the grand jury that indicts him, or the venire from which the jurors are chosen, see Swain v. State of Alabama, 1965, 380 U.S. 202, 208, 85 S.Ct. 824, 829, 13 L.Ed.2d 759, and cases cited therein, the law is well established that the type of selection procedure employed by the commissioners in this case cannot be excused. The frequently quoted language from Cassell v. State of Texas, 1950, 339 U.S. 282, 289, 70 S.Ct. 629, 633, 94 L.Ed. 839, is particularly applicable here:

> "When the commissioners were appointed as judicial administrative officials, *it was their duty to familiarize themselves fairly with the qualifications of the eligible jurors of the county without regard to race and color.* They did not do so here, and the result has been racial discrimination. We repeat the recent statement of Chief Justice Stone in Hill v. State of Texas, 316 U.S. 400, 404, 62 S.Ct. 1159, 1161, 86 L.Ed. 1559: 'Discrimination can arise from the action of commissioners who exclude all negroes whom they do not know to be qualified and who neither know nor seek to learn whether there are in fact any qualified to serve. In such a case discrimination necessarily results where there are qualified negroes available for jury service. * * *'" (Emphasis added.)

Equally in point is the following statement from Avery v. State of Georgia, 1953, 345 U.S. 559, 561, 73 S.Ct. 891, 892, 97 L.Ed. 1244:

> "The Jury Commissioners, and the other officials responsible for the selection of this panel, were under a constitutional duty to follow a procedure— 'a course of conduct'—which would

not 'operate to discriminate in the selection of jurors on racial grounds.' Hill v. State of Texas, 1942, 316 U.S. 400, 404, 62 S.Ct. 1159, 1161, 86 L.Ed. 1559. If they failed in that duty, then this conviction must be reversed—no matter how strong the evidence of petitioner's guilt. That is the law established by decisions of this Court spanning more than seventy years of interpretation of the meaning of 'equal protection.'"

Thus we need not delve into the subjective intent of the jury commissioners, see United States ex rel. Seals v. Wiman, 5th Cir. 1962, 304 F.2d 53, 65, nor need we credit their general assertions that they did not participate in any system or plan by which Negroes were systematically excluded from jury service, see Eubanks v. State of Louisiana, 1958, 356 U.S. 584, 587, 78 S.Ct. 970, 973, 2 L.Ed.2d 991; see also Scott v. Walker, supra, since it is clear that they did not fulfill their duty of familiarizing themselves with the qualifications of Negroes eligible for jury service.

Furthermore, on the record before us, we cannot be persuaded by the fact that some of the commissioners testified that there may have been more Negroes on the various lists than those which they were able to identify. The evidence elicited by appellant was clearly sufficient to make out a *"prima facie* case of the denial of the equal protection which the Constitution guarantees." Norris v. State of Alabama, 1935, 294 U.S. 587, 591, 55 S.Ct. 579, 581, 79 L.Ed. 1074; Arnold v. North Carolina, 1964, 376 U.S. 773, 774, 84 S.Ct. 1032, 12 L.Ed. 2d 77, 79. It therefore became the State's burden to rebut the appellant's evidence. This the State did not do.

The State relies on Swain v. State of Alabama, supra, for the proposition that appellant did not make out a prima facie case. *Swain's* possible application to the selection of grand juries in this case will be discussed later; but it is easily distinguishable from the instant case insofar as the selection of petit juries is concerned. In *Swain,* there was an average

of six to seven Negroes on petit jury venires in criminal cases during the period in question, while in this case not one Negro was selected for any of the eleven petit jury venires of thirty each during 1958 and 1959. In *Swain*, the overall percentage disparity was "small," which is not the case here. Furthermore, while the Supreme Court in *Swain* noted that the "record contains no admission by the commissioners that they had relatively few Negro acquaintances * *," 380 U.S. at 207, 85 S.Ct. at 829, n. 4, the record in the case at bar is replete with such admissions.

■ The result is that the record speaks for itself, and compels a holding that the exclusion of Negroes from the petit jury which convicted appellant was not due to chance or accident but was the result of a discriminatory course of conduct followed in the selection of prospective jurors. Accordingly, appellant's conviction must be reversed on this ground.

The next question to be decided is whether appellant's indictment should have been quashed. As stated earlier, during the period in question, each of the four twelve-member grand juries was chosen from a separate "list of grand jurors." Each list of grand jurors was composed of twenty names which had been selected from the general venire list as supplemented by the supplemental venire list.

Although the record is unclear as to the composition of any of the actual grand juries during 1958 and 1959, it does reflect the racial composition of the four grand jury lists of twenty persons each drawn during that time. Of the four lists, the record shows that none had more than two Negroes on it, and each had at least one Negro. A total of

six Negroes were identified out of the eighty persons on the four grand jury lists. Thus Negroes comprised 7.5% of the persons on the four lists.[7]

The evidence also establishes that the names on the various grand jury lists were not drawn at random from the general venire list. On the contrary, the testimony of the commissioners shows that the commissioners purposely chose prospective grand jurors from the names on the general venire list as supplemented by the supplemental venire list.[8] Thus, Commissioner Johnson testified that the Clerk, Mr. Landry, told him "to have three [names] for the grand jury and whatever else for the petit jury," and that his selections for the grand jury list were usually leaders in the community and were better educated than those people whose names he submitted for prospective petit jury service. Likewise, Mr. Landry testified that he instructed the commissioners to submit a given number of names for grand jury service and a given number for petit jury service.

Appellant strongly urges that a token number of Negroes were deliberately included on the grand jury lists. In support of this argument, appellant relies upon the testimony of the commissioners, especially Commissioners Johnson and Myers. Mr. Johnson testified that he always tried to submit the name of at least one Negro for the grand jury list but that he did not remember ever submitting the names of two Negroes, and Mr. Myers testified that he "occasionally" submitted one Negro name for the grand jury list. Appellant's argument is further buttressed by the fact that, of the nine Negro names identified by the commissioners out of the 502 names they submitted to supplement the general venire

7. The grand jury list compiled on February 5, 1958, contained two Negroes; the grand jury list prepared on July 16, 1958, contained one Negro; the list made up on January 21, 1959, from which was drawn the twelve-member grand jury which indicted the appellant, contained two Negroes; and the grand jury list prepared

on July 22, 1959, had on it the name of one Negro.

8. Since appellant's indictment, Louisiana law has been amended to provide that the grand jury list is to be drawn *by lot* from the general venire list. LSA–R.S. 15:180, as amended by Acts 1964, No. 161, § 1.

list in 1958 and 1959, five of the nine were included in the grand jury lists.[9]

Still another point which lends support to appellant's theory of token systematic inclusion on the grand jury lists is that both of the Negro names on the supplemental venire list of January 21, 1959, had beside them the letter "c". The Clerk testified that this designation meant that the person was colored. Both of these names were selected for the grand jury list from which was chosen the grand jury which indicted the appellant.

As it did with regard to the selection of petit juries the State relies on Swain v. State of Alabama, supra. *Swain* appears to come closer to the instant case when those facts in *Swain* concerning the selection of grand juries are compared to those isolated facts and figures pertaining to the four "lists of grand jurors" in this case. In *Swain,* Negroes served on 80% of the grand juries selected, the number ranging from one to three. In this case, one or two Negroes were present on all four of the grand jury lists from which the grand juries were chosen. In *Swain,* the Court stated: "We cannot say that purposeful discrimination based on race alone is satisfactorily proven by showing that an identifiable group in a community is underrepresented by as much as 10%." 380 U.S. at 208–209, 85 S.Ct. at 829. In the instant case, as stated earlier, Negroes comprised 7.5% of the 80 persons on the four grand jury lists and Negro males of age 21 and over represented about 16% of the male population in that age group in Acadia Parish.

█ There is, however, a fatal flaw in this type of analysis, since it is based on the erroneous assumption that prospective grand jurors were selected from a general venire list which was not tainted by an unconstitutional selection procedure followed by the commissioners. Of course, such is not the case here, for, as we demonstrated in the first part of this opinion, the jury commissioners have failed to fulfill "their duty to familiarize themselves fairly with the qualifications of the eligible jurors of the county without regard to race and color." Cassell v. State of Texas, supra. Thus, as is true in this case, whenever a venire or panel from which a petit jury or grand jury is to be chosen is tainted in this manner, the petit jury or grand jury selected therefrom is necessarily defective.

This conclusion is compelled by Pierre v. State of Louisiana, 1939, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757. There the Supreme Court was confronted with a situation where a Louisiana trial judge had sustained a defendant's motion to quash a petit jury venire and panel, but had refused to quash the grand jury panel and the indictment. In holding that the indictment should have been quashed, the Court stated:

"If petitioner's evidence of such systematic exclusion of negroes from the general venire was sufficient to support the trial court's action in quashing the Petit Jury drawn from that general venire, *it necessarily follows that the indictment returned by a Grand Jury, selected from the same general venire, should also have been quashed.* Id. at 358, 59 S.Ct. at 538. (Emphasis added.)

We therefore hold that the grand jury selection process was constitutionally deficient because the lists from which the prospective grand jurors were chosen were the product of the same unconstitutional course of conduct which resulted in discrimination in the selection of petit juries. This holding makes it unnecessary to decide whether Negroes were deliberately included on the grand jury lists in a token number.

█ Of course, our holding that appellant's indictment should have been quashed does not mean that appellant may go free. The State "may indict and

9. Evidently during some prior year, one of the commissioners had submitted at least one other Negro name, since a Negro (Ramsey Randle) appeared on the grand jury list drawn on July 22, 1959, whose name had not been put on the supplemental general venire list in 1958 or 1959.

try him again by the procedure which conforms to constitutional requirements." Hill v. State of Texas, 1942, 316 U.S. 400, 406, 62 S.Ct. 1159, 1162, 86 L.Ed. 1559.

## II.

Admissibility of Appellant's Confession

■ In the habeas corpus hearing before the District Court, appellant contended that his confession had not been voluntarily given, and that his constitutional rights were violated in that he had not been effectively advised of his right to remain silent or of his right to the assistance of counsel. Appellant did not testify at the habeas corpus hearing, and while State officers who arrested and questioned him did testify, their testimony is unclear and in conflict on the questions of whether he was in fact advised of his right to remain silent and of his right to counsel.

The District Court rejected all of appellant's contentions, but that court's decision was rendered prior to Escobedo v. State of Illinois, 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977. There the Supreme Court stated:

"We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the As-

sistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainwright, 372 U.S. [335] at 342, 83 S.Ct. [792] at 795 [9 L.Ed.2d 799] and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." 378 U.S. at 491, 84 S.Ct. at 1765.

Several cases bearing on the scope of Escobedo have already been argued before the Supreme Court and no doubt will soon be decided.[10] Assuming that appellant is re-indicted and retried, the conflicts in the testimony with regard to the circumstances surrounding appellant's confession should be resolved, but we feel that they can best be resolved by the State trial court in light of Escobedo, the forthcoming Supreme Court decisions and any further evidence which might be presented on retrial. Of course, the Supreme Court has also said that "whatever independent significance" may be attached to such factors as the failure to advise a defendant of his right to counsel and of his right to remain silent, "they are unquestionably attendant circumstances which the accused is entitled to have appropriately considered in determining voluntariness and admissibility of his confession." Haynes v. State of Washington, 1963, 373 U.S. 503, 517, 83 S.Ct. 1336, 1345, 10 L.Ed.2d 513.

The judgment of the District Court is reversed and the cause is remanded with directions to issue the writ of habeas corpus releasing the appellant from custody on his present conviction and sentence, subject to re-indictment and retrial by the State.

Reversed and remanded.

10. These cases are as follows: Miranda v. Arizona, No. 759; Vignera v. New York, No. 760; Westover v. United States, No. 761; Johnson v. New Jersey, No. 762; and California v. Stewart, No. 584. See 86 S.Ct. 1602 and 1772.