HAMLIN, Justice:
Defendant appeals from his conviction of the murder of Johnny Lee Austin and his sentence to be confined in the Louisiana State Penitentiary for life. See, LSA-R.S. 14:30.
Only one bill of exceptions is presented for our consideration.[1] It advances important constitutional issues hereinafter discussed.
Bill of Exceptions No. 1 was reserved when the trial court denied defendant’s, motion to quash and set aside the indictment returned against him by the Grand Jury of East Baton Rouge Parish, the General Venire List, the Petit Jury Venire, the Grand Jury Venire, and the Grand Jury.
In Bill of Exceptions No. 1, defendant avers:
“ * * * that the Court’s overruling of the aforesaid motion is contrary to the law and the evidence for the reason, among others, that the evidence shows. *1118 that the General Venire List of 300 persons was selected from solely the list of registered voters, which is not a constitutional representation of those persons eligible to serve as jurors; for the further reason that the evidence shows that there is not a true representation of those persons of the Negro race who had any chance of being selected to serve as a juror; that there are large numbers of persons who are residents of East Baton Rouge Parish who are not registered voters, regardless of their race or color, and who do not have any opportunity of serving as a juror; that the General Venire List, the Grand Jury Venire, Grand Jury, and the Petit Jury Venire, all chosen from the General Venire List, discriminate against the defendant and are contrary to the laws and constitution of the State of Louisiana and the laws and constitution of the United States and deprive the defendant of his constitutional rights and equal protection under the laws of the State of Louisiana and the laws of the United States.”
Herein, defendant avers that the jury was drawn from a general venire list which was not a cross section and not representative of all the significantly identifiable racial groups in the Parish of East Baton Rouge, specifically negroes. He still further avers that the jury commissioners failed to obtain knowledge of and become acquainted with the significant identifiable racial groups in East Baton Rouge Parish, specifically negroes, in the selection of the general venire list.
Counsel for defendant argues that the State has the burden to prove that the general venire list, and consequently the petit jury venire, was chosen in such a way that it was representative of all significant racial groups in the Parish.
On trial of the Motion to Quash, the following testimony was adduced from Perry M. Johnson, Clerk of Court, Nineteenth Judicial District Court for the Parish of East Baton Rouge, Louisiana: (This testimony is not in the record but is incorporated in defendant’s brief; it is not controverted.)
“Q. Mr. Johnson, we have a motion before the Court this morning that deals with the selection of the General Venire list in this Parish, as well as the selection from that General Venire list of the grand jury list of the grand jury and Petit Jury, and trying to conserve time, I’m going to lead you a little bit, since we went over this same motion in another case last week. Am I correct in stating that a list of 300 names is drawn from a drum which is maintained in the basement of this Courthouse?
“A. That’s correct.
“Q. And that’s what we call the General Venire list?
*1120 “A. Yes.
“Q. Am I correct in stating that the names in that drum are printed on' little cards and that those names are taken from the Registrar of Voters’ list?
“A. Yes,, sir.
“Q. And I believe this system has been used by the jury commission for about the past year ?
’■“A. A little over a year, April a.year ago — this April was a’ year.
“Q. Yes, sir. And I believe that no other names, other than the names of registered voters are put into this drum, is that correct?
“A. No, sir, they have been added since we. had the last case..
. ,“Q: - Since we had-the last hearing, you
.. : have added' some names ?• ■
“A.; 'Yes, sir. '
“Q. Well, let’s see, the last hearing that . . we had on this subject was — that was last Tuesday, I believe. The grand Jury that indicted the accused would have been called prior to that time, is that correct, sir?
'■•“A, That’s correct:
“Q. Now, how about the petit jury? Will it be drawn from a — the-petit : ' ■' jury ;in' Jandáry — -will it'be drawn from a general venire list that’s already in existence or will it he a new general venire list ?
“A. We have already drawn one for January. I don’t know whether this is the same one that’s trying this accused or not, but after that date, there are some names in there now from the telephone directory. They are not all from the registration list.
“Q. The general venire list for the month of January you say is already drawn?
“A. We have drawn one. I don’t know whether it’s the same one that will try this accused or not. I have no knowledge of the cases set for trial.
“MR. SCUELIN: May I ask the District Attorney when this case is set for trial?
.“MR. GUEYMARD: January 9.
“Q. January 9?
“A. I believe we have already drawn that one.
“Q. So the general venire list for the jury for January 9 was drawn under the system you used up until last Tuesday, is that right?
..“A,. Right.
“Q. And under that • system that was ■' used,' the "only haines thaf went into- ’ the drum that’s downstairs in the *1122 basement are the names of registered voters ?
“A. Correct.”
In Smith v. State of Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84, the United States Supreme Court stated: public justice that the jury be a body truly representative of the community. For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government. * * * ”[2]
“It is part of the established tradition in the use of juries as instruments of
*1124 Mr. Johnson’s testimony, supra, is to the effect that the instant general venire list was selected solely from names taken from the Registrar of Voters' list. There is no statement as to whether the list does or does not contain the names of persons truly representative of the community. Likewise, his testimony does not reflect whether the list drawn contained or did not contain the names of persons truly representative of the community. Mr. Johnson’s testimony is strictly factual.
Defendant offered no testimony with respect to the composition of the Registrar of Voters’ list. No testimony was offered as to whether the list as a whole or its component parts represented a true picture of the Parish of East Baton Rouge. There was no testimony as to whether it represented area groups — rich and poor. No testimony was adduced as to the caliber of the jury commissioners; there was no testimony as to their identity or non-identity with area groups. There was no testimony showing that certain areas of the community were inhabited by non-voters. There was no showing of racial prejudice.
Defendant did not make out a prima facie case of denial of the equal protection of the laws which the Constitutions of Louisiana and the United States guarantee. Coleman v. Alabama, 389 U.S. 22, 88 S.Ct. 2, 19 L.Ed.2d 22. See, Davis v. Davis, 5 Cir., 361 F.2d 770. Under such circumstances, there was nothing for the State to rebut. The burden of making out a prima facie case rested upon the defendant. State v. Goree, 245 La. 389, 158 So.2d 203, and authorities therein cited. Defendant did not bear his burden. He neither made a showing of prejudice, nor showed that he suffered discrimination denying him equal protection of the laws.[3]
Bill of Exceptions No. 1 is without merit.
For the reasons assigned, the conviction and sentence are affirmed.

. Only two bills of exceptions were reseryed by counsel for the defendant. Bill of Exceptions No. 2 was reserved when the trial court overruled defendant’s motion for a new trial.

. In the recent case of Brooks v. Beto, 366 F.2d 1, 23, cert. den. 386 U.S. 975, 87 S.Ct. 1169, 18 L.Ed.2d 135 (1966), the United States Court of Appeals, Fifth Circuit, stated:
“To fairly represent the community, there must be an awareness of the makeup of that community. Even random selection from broad lists, such as voter registration records, city directories, tax rolls, public utility customer lists, and the like, inescapably requires a basic preliminary test: do each, or all, or some, give a true picture of the community and its components ? Of course that condition precedent may be satisfied only by testing this ‘sample’ against the known components — racial, economic, sociological, educational, etc. It is inevitable, therefore, that jury selectors be conscious of those components. And where identifiable racial groups are significant elements, that means there must be an awareness of race as such.
“But even more subjective is the demand that jury selectors make themselves acquainted with, not .just the class, but the members of it in order to determine the identity and availability of individuals who have the qualifications for potential jurors and whose presence is required in the ‘universe’ to assure -fair community representation. Here again noncontroversial distinctions'illustrate the process. In a municipality where, as is ■frequent, geographical areas — precincts, wards, sections — reflect significant groups, such as laborers, highly educated professionals or executives, those of lower incomes, the wealthy, or the like, jury selectors must first ‘know’ that community. But they must also ‘know’ the internal structure of such area groupings sufficiently to be able to determine identity and availability of those qualified to serve.
“There are, of course, a variety of ways of going about this. One, obviously, is fairly to place on the juror-selecting body persons from or closely identifiable with such groups. The selectors thus serve the dual role as selectors and as the source of indispensable information. Another, broadly, is the establishment of a more or less systemized procedure for contacting responsible members or organizations within the class to obtain names or lists of names of those likely to be available and qualified. But whether one or the other, or some other variation, the process has a single end: to know the availability of persons in that class. The subject of scrutiny is that class. It is people within that class who are the object of the search. In the look and in the discovery, it is membership in that class which is the decisive thing.
' “When that class is a racial group and, moreover, a racial group which historically has been the object or victim of state-generated discrimination, the selectors can perform their constitutionally-imposed duty only by being conscious of that class. This means they must be conscious of that race. And they must be conscious that the system contrived or followed by them has as its conscious aim the supplying of persons of that race *1124 for inclusion in the ‘universe.’ In a setting where the presence of the Negro race in the community structure sets in motion the constitutional duty to know, a juror selector could fulfill that duty only by being aware of that race and the steps reasonably needed to assure representation of that race in the ‘universe’ from which jurors are obtained. Not only may he do so, he must. * * * ” See, also, United States v. Greenberg, D.C., 200 F.Supp. 382, 395; Rabinowitz v. United States, 5 Cir., 366 F.2d 34, 57; Hoyt v. State of Florida, 368 U.S. 57, 69, 82 S.Ct. 159, 166, 7 L.Ed.2d 118, 126; Scott v. Walker, 5 Cir., 358 F.2d 561.

. “Unless there is a showing that the voter registration rolls do not, in fact, represent a fair cross section of the community, there is nothing to prevent the jury selectors from using those rolls as a source, or in fact as the source of names of prospective jurors. * * * ” United States ex rel. Wilson v. Walker, D.C., 263 F.Supp. 289, 294.