**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Carlos MARCELLO, Defendant-Appellant.**

**No. 26773.**

United States Court of Appeals, Fifth Circuit.

Feb. 18, 1970.

Rehearing Denied and Rehearing En Banc Denied April 1, 1970.

Certiorari Denied June 15, 1970. See 90 S.Ct. 2172.

---

Jack Wasserman, Washington, D. C., G. Wray Gill, George M. Leppert, New Orleans, La., Michel A. Maroun, Shreveport, La., Anthony C. Friloux, Jr., Houston, Tex., for defendant-appellant.

Morton L. Susman, U. S. Atty., James R. Gough, Ronald J. Blask, Asst. U. S. Attys., Houston, Tex., Louis C. LaCour, U. S. Atty., New Orleans, La., Owen A. Neff, Atty., Dept. of Justice, Washington, D. C., Anthony J. P. Farris, U. S. Atty., Malcolm R. Dimmitt, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, DYER, Circuit Judge and HUNTER, District Judge.

JOHN R. BROWN, Chief Judge:

This is an appeal from Appellant's conviction of forcibly assaulting and intimidating an officer of the FBI in violation of 18 U.S.C.A. § 111.[1] Fifteen points of error are raised, each of which we find wanting and affirm.

On September 30, 1966 Carlos Marcello arrived at the New Orleans airport where, because of his reputation as a Mafia boss, he was immediately surrounded by newspapermen and photographers. Among this group was FBI agent Patrick Collins, posing as a deplaning passenger, and his co-agent photographer whose job it was to keep an eye on Marcello. This crowd followed Marcello through the airport and onto the upper ramp outside where Marcello, angrily and with some profanity, inquired whether the photographers had taken enough pictures. Collins, with arms folded, answered in the negative, and Marcello retorted: "Are you looking for trouble?" which elicited the not unexpected reply from Collins that "I can handle trouble." This exchange had an unsettling effect on Marcello who took a couple of short jabs at Collins and attempted to mow him down with a haymaker, which never really got off the ground because of his brother Joseph's restraint. For this fray Marcello was first indicted on October 7, 1966 for assault, but this indictment was dismissed on a motion asserting a failure to comply with the requirements of Rabinowitz v. United States, 5 Cir., 1966, 366 F.2d 34 (en banc). On June 1, 1967, he was reindicted by a grand jury in the New Orleans division of the Eastern District of Louisiana for the same offense.

On July 3, 1967 Appellant filed, among others, a "motion for continuance and for a change of venue." These motions were heard on September 13, 1967, and the motion for a change of venue was immediately granted because of extensive prejudicial publicity in the New Orleans area. Not more than 10 minutes after the conclusion of the hearing and the granting of the motion, defense counsel made an oral ex parte request for the Court to withdraw its order. The Court kept this motion under advisement for 5 months and on March 1, 1968, it ordered the case transferred to the Southern District of Texas. The case came on for trial before Judge Connally in Laredo, Texas in May of 1968 and resulted in a hung jury and mistrial on May 29. The case was reset before

---

1. 18 U.S.C.A. § 111 provides:

"Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of his official duties, shall be fined not more than $5,000 or imprisoned not more than three years, or both.

Whoever, in the commission of any such acts uses a deadly or dangerous weapon, shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

18 U.S.C.A. § 111.

"Any officer or employee of the Federal Bureau of Investigation of the Department of Justice" is among the "persons designated in section 1114."

Judge Singleton in Houston and on August 8, 1968 a verdict of guilty was returned. On September 12, 1968 Appellant was fined $5000 and sentenced to two years imprisonment.

Appellant's argument on appeal is pentadecal. He raises issues concerning (1) the constitution of the grand jury, (2) failure of the indictment to allege an offense, (3) procurement of the indictment by misconduct, (4) immunity from prosecution, (5) change of venue, (6) change of place of trial, (7) deprivation of records, (8) Cosa Nostra and Mafia references at the trial, (9) improper reference to a document not in evidence, (10) knowledge as an element of the offense, (11) willful intent to injure as an element of the offense, (12) entrapment, (13) refusal of the Trial Court to require an election between the issues of intimidation and assault, (14) refusal to grant motion of acquittal, motion in arrest of judgment and a new trial, (15) improper basis for sentencing.

### 1. Illegal Grand Jury

Appellant's first point is that he was denied his right to be indicted by a grand jury compiled from a fair cross section of the community. Hill v. Texas, 1942, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559; Rabinowitz v. United States, 5 Cir., 1966, 366 F.2d 34 (en banc). The jury list from which the indicting grand jurors were chosen was composed of residents of only 7 of the 13 parishes comprising the New Orleans Division of the Eastern District of Louisiana [2] pursuant to a direction by the Court under the power granted it by 28 U.S.C.A. § 1865(a),[3] as it existed prior to the Jury Selection and Service Act of 1968.[4]

2. The omitted parishes were Assumption, La Fourche, St. James, Tangipahoa, Terrebonne, and Washington.

3. Section 1865(a) provided:
"Grand and petit jurors shall from time to time be selected from such parts of the district as the court directs so as to be most favorable to an impartial trial, and not to incur unnecessary expense or unduly burden the citizens of any part of the district with jury service. To this end the court may direct the maintenance of separate jury boxes for some or all of the places for holding court in the district and may appoint a jury commissioner for each such place."
28 U.S.C.A. § 1865(a).
See note 4, infra.

4. On December 22, 1968 the new Jury Selection and Service Act, 28 U.S.C.A. § 1861 et seq., amending § 1865(a) note 3, supra, § 1862 note 6, infra, § 1863 note 7, infra, became effective. It calls for the adoption by the District Court as the reviewing panel (Judicial Council and the Chief District Judge concerned) of a "written plan for random selection of grand and petit jurors that shall be designed to achieve the objectives of sections 1861 [selection at random from a fair cross section] and 1862 [prohibition of a discrimination] * * *."
"Among other things, such plans shall—
 * * * * *

(5) specify those groups of persons or occupational classes whose members shall, on individual request therefor, be excused from jury service. Such groups or classes shall be excused only if the district court finds, and the plan states, that jury service by such class or group would entail undue hardship or extreme inconvenience to the members thereof, and excuse of members thereof would not be inconsistent with sections 1861 and 1862 of this title.

(6) specify those groups of persons or occupational classes whose members shall be barred from jury service on the ground that they are exempt. Such groups or classes shall be exempt only if the district court finds, and the plan states, that their exemption is in the public interest and would not be inconsistent with sections 1861 and 1862 of this title. The plan shall provide for exemption of the following persons: (i) members in active service in the Armed Forces of the United States; (ii) members of the fire or police departments of any State, district, territory, possession, or subdivision thereof; (iii) public officers in the executive, legislative, or judicial branches of the Government of the United States, or any State, district, territory, or possession or subdivision thereof, who are actively engaged in the performance of official duties.

(7) fix the distance, either in miles or in travel time, from each place of

The indictment in a criminal case must be returned by a grand jury "drawn from a pool of persons broadly representative of the community." Rabinowitz v. United States, *supra*, at 45.[5] This, of course, does not mean that every conceivable group has to be represented on the jury list.[6] What it does mean is that the list must generally approximate the community and its different interests. Smith v. Texas, note 5, *supra*.

Appellant attacks on two grounds the exclusion of names from the 6 parishes. First, he says that it was taken pursuant to 28 U.S.C.A. § 1863 [7] (before the 1968 amendments) and that since no findings were made by the Trial Judge as required by § 1863, the exclusion was invalid. The fact of the matter is that the parishes were not excluded by a single Trial Judge under § 1863. Rath-

er, they were excluded by order of the District Court en banc dated October 8, 1948 as amended on January 20, 1967 by adding the parishes of St. John the Baptist and St. Charles pursuant to the authority granted by 28 U.S.C.A. § 1865 [8] (before its amendment).

Appellant has not shown that the exclusion of the parishes is anything but conducive to the goal of achieving an impartial trial without incurring unnecessary expense or unduly burdening the citizens of any part of the district with jury service. The action of the Judges of the Eastern District of Louisiana was reasonable and in accord with § 1865 and the Constitution.

A related complaint is that, disregarding the technical validity of the excluding order, it resulted in a jury list that was not representative of the com-

holding court beyond which prospective jurors residing shall, on individual request therefor, be excused from jury service on the ground of undue hardship in traveling to the place where court is held."

The new act specifically does not apply to the case at bar:

"This Act shall not apply in any case in which an indictment has been returned or petit jury empaneled prior to such effective date [December 22, 1968].

Pub.L. 90–274, § 104, 82 Stat. 53:

The reviewing panels for all the Districts in the Fifth Circuit adopted plans which prescribe, among other things, that grand jurors are to be drawn from the whole of the District or Division for District or Division grand juries respectively. See Judge Gewin's article, The Jury Selection and Service Act of 1968: Implementation in the Fifth Circuit Court of Appeals, 20 Mercer L.Rev. 349 (1969).

5. See Smith v. Texas, 1940, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84; Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Thiel v. Southern Pacific Co., 1946, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181; Mobley v. United States, 5 Cir., 1967, 379 F.2d 768. See also the series of en banc decisions of this Court heard with *Rabinowitz*: Scott v. Walker, 5 Cir., 1966, 358 F.2d 561, 564; Billingsley v. Clayton, 5 Cir., 1966, 359 F.2d 13, cert. denied, 385

U.S. 841, 87 S.Ct. 92, 17 L.Ed.2d 74; Davis v. Davis, 5 Cir., 1966, 361 F.2d 770; Labat v. Bennett, 5 Cir., 1966, 365 F.2d 698, cert. denied, 1967, 386 U.S. 991, 87 S.Ct. 1303, 18 L.Ed.2d 334; Brooks v. Beto, 5 Cir., 1966, 366 F.2d 1, cert. denied, 1967, 386 U.S. 975, 87 S.Ct. 1169, 18 L.Ed.2d 135.

6. For example, firemen were excluded by statute, 28 U.S.C.A. § 1862. The new Act also provides for their exclusion. See note 4, *supra*.

7. Section 1863 provided:

"(a) A district judge for good cause may excuse or exclude from jury service any person called as a juror.

(b) Any class or group of persons may, for the public interest, be excluded from the jury panel or excused from service as jurors by order of the district judge based on a finding that such jury service would entail undue hardship, extreme inconvenience or serious obstruction or delay in the fair and impartial administration of justice.

(c) No citizen shall be excluded from service as grand or petit juror in any court of the United States on account of race or color."

28 U.S.C.A. § 1863.

See note 4, *supra*.

8. See notes 3 and 4, *supra*.

On this record the constitutionality of § 1865 in its pre-1968 form is not open to question.

munity in that blue collar workers were systematically excluded, if not completely, at least partially, from the list by reason of the parish exclusion. See Labat v. Bennett, note 5, *supra*. He offered no facts to establish the truth of this assertion, and since the burden is on him to do so, Jackson v. Morrow, 5 Cir., 1968, 404 F.2d 903; Ware v. United States, 1965, 123 U.S.App.D.C. 34, 356 F.2d 787, cert. denied, 383 U.S. 919, 86 S.Ct. 914, 15 L.Ed.2d 673; Frazier v. United States, 1948, 335 U.S. 497, 503, 69 S.Ct. 201, 205, 93 L.Ed. 187, 194; Glasser v. United States, 1942, 315 U.S. 60, 87, 62 S.Ct 457, 86 L.Ed. 680, this contention fails.

## 2. Insufficient Indictment

Appellant's second contention is that the indictment failed to allege an offense. The indictment alleged that Carlos Marcello "did forcibly assault and intimidate Patrick J. Collins, Jr., an officer of the Federal Bureau of Investigation, while * * * Collins was engaged in the performance of his official duties in violation of Title 18, United States Code, Section 111." In almost the same words (see note 1, *supra*) § 111 makes it a crime to do just this.

Appellant offers no argument on appeal to support his contention, but at the pre-trial stage he argued that the indictment did not allege that Marcello knew Collins to be an FBI agent and that knowledge is an element of the offense. This same contention is more forcefully raised later (contention number 10) and we will discuss it then. It suffices to say that Appellant's second contention is wholly without merit.

## 3. Prosecution Misconduct

█ Appellant's third contention, that the indictment was procured by the misconduct of the prosecuting officials and therefore should have been dismissed, is apparently based on a statement reportedly made by a government attorney to the New Orleans press that the arrest of Marcello in New York City at an organized crime meeting "makes it obvious that there is organized crime in this area [New Orleans] and that Marcello was there in the interests of this area." Marcello asserts that this announcement was highly improper and was calculated to and did influence the grand jury in its deliberations in bringing the indictment. That the claim borders on the frivolous is shown by the fact that the statement was made before the occurrence of the incident leading to his indictment. It appeared in the newspaper on Friday morning, September 30, 1966. The assault did not occur until that evening.

## 4. Immunity

Appellant's next contention meets the same fate as his preceding ones. After the alleged assault but before the Federal trial, Appellant was called before a Queens County, New York grand jury investigating organized crime. Under the New York State immunity statute he was granted immunity from prosecution (as well as from the use of testimony elicited) for any crime he might mention in his testimony. While testifying he was asked whether he was under indictment anywhere and replied that he was, in Louisiana for assault on a federal officer. Now he contends that his answer while under the Queens grand jury's grant of immunity insulates him from prosecution for this crime in Federal Court in Louisiana and Texas.

He argues that Murphy v. Waterfront Commission, 1964, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678, holds that when the state grants immunity to a witness, this grant is binding on the federal government. Hence, the argument goes, the Queens grant immunized him from prosecution for any crime mentioned and since he mentioned that he had been indicted for assault, Queens could not try him for this assault, and since Queens could not try him neither could the United States.

█ This contention fails for several reasons. The most obvious of which is that if his contention were accepted then any arm of the state with state-be-

queathed power to grant immunity could thwart any federal prosecution. The power to grant immunity from prosecution may not be the power to destroy, M'Culloch v. Maryland, 1819, 17 U.S. (4 Wheat) 316, 4 L.Ed. 579, but it would then be the power to frustrate federal crime control. In opposition to this approach it is urged that protection of a defendant's Fifth Amendment privilege against self-incrimination outweighs the possibility of harm that a state could cause. But *Murphy, supra* provides adequate protection for these rights by denying to the federal government the use of Defendant's testimony.

A second reason why Defendant's argument must be rejected is because as to the question posed and its answer, he did not have the privilege against self-incrimination. Consequently the grant of immunity did not cover his response.

There was no basis for the privilege here because the information gleened from an answer to this question, no matter what the answer might have been, could not possibly result in, or present evidence leading to, any criminal or civil liability relating to a penalty or forfeiture since the information contained in the statement was already a matter of public record. The question and answer revealed nothing new or unknown.

### 5. Venue

Appellant's fifth contention is that the District Court erred in changing venue from the Eastern District of Louisiana to the Southern District of Texas and that he was thereby denied his Article 3, § 2, cl. 3 and Sixth Amendment and Rule 18 rights to a trial by an impartial jury of the State and district where the crime was committed.[9]

The facts here are of the utmost importance. On July 3, 1967, defendant moved for a continuance and for a change of venue[10] because of "widespread front-page newspaper coverage" of the alleged assault and other publicity which "was such as to prejudice the readers of the same against defendant." With this motion defendant filed as exhibits several New Orleans newspaper articles which, to say the least, were highly inflammatory.[11] On August 1,

---

9. Article III, § 2, cl. 3 provides:
"The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed."
U.S.Const. art. III, § 2, cl. 3.
The Sixth Amendment provides:
"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining Witnesses in his favor, and to have the Assistance of Counsel for his defence."
U.S.Const. amend. VI.
Rule 18 provides:
"Except as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed. The court shall fix the place of trial within the district with due regard to the convenience of the defendant and the witnesses."
F.R.Crim.P. 18.

10. Rule 21(a) provides:
"(a) *For Prejudice in the District.* The court upon motion of the defendant shall transfer the proceeding as to him to another district whether or not such district is specified in the defendant's motion if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district."
F.R.Crim.P. 21(a).

11. Appellant filed seven exhibits consisting of articles, editorials, and photographs found in the New Orleans newspapers, *The Times-Picayune* and *The States-Item*, during the period from September 23, 1966 to October 1, 1966. The first was an article and accompanying photographs in the September 23 *Times-*

1967 this and other motions were continued to September 13, 1967 when they came up for hearing before Judge Heebe. At the Judge's suggestion, in which all acquiesced, the motion styled "Motion for Continuance and for a Change of Venue" was heard first, his reasoning being that disposition of the venue motion favorable to defendant would make determination of the other motions inappropriate since they would be transferred with the case.

Appellant's counsel opened the hearing by pointing out three groups of instances that persuasively proved that Marcello could not get a constitutionally guaranteed fair trial in Louisiana. One was several newspaper articles in the New Orleans area (see note 11, *supra*), another was an article in the September 1, 1967 issue of *Life Magazine* [12] and the third consisted of two published statements by Louisiana Governor McKeithen.[13] Counsel then stated:

"Now, it is in this atmosphere, nationwide, adverse publicity that we are asked to try this particular case. At the time I originally prepared the motion I thought maybe something could be done to assist Mr. Marcello with regard to a change of venue. But I know of no place where I think at this particular time, with the adverse publicity at its height, that Mr. Marcello would receive a fair trial, in view of this adverse publicity. * * *

* * * * * *

"My motion * * * this afternoon is for a five-month continuance. I feel we should not be obliged to try this case in this atmosphere at this time. *I am, naturally, withdrawing a request for a change of venue—I beg your pardon—I am not pressing my request for a change of venue at this time.*

* * * * * *

"I am only pressing at this time the request for a postponement until, unfortunately, I think until after election, and until after this publicity, which I feel may continue for some time."

*Picayune* describing a raid in Queens, New York upon a "little Apalachin" meeting (this term came from "the 1957 gangland conference of 60 hoodlums and their friends at Apalachin, New York") with Carlos Marcello in attendance. The second is a September 26 *States-Item* political-type cartoon pointing out Marcello's presence at the raided meeting and his avoidance of deportation for 13 years. The third exhibit consists of two front-page *States-Item* articles of September 26 —one concerning the investigation of organized crime in New Orleans, tying in the Queens "little Apalachin" meeting, and the other telling of a bomb scare delaying the Queens County grand jury questioning of "12 reputed Mafia leaders, including Jefferson Parish rackets figure Carlos Marcello * * *."

Next we find a front-page story in the *Times-Picayune* of September 30 and an editorial in the October 1 issue of *States-Item* both quoting the coordinator of the Department of Justice's organized crime section for Louisiana, Mississippi, Alabama, and Georgia as saying that the recent arrest of Carlos Marcello in New York "makes it obvious that there is organized crime in this area and that Mar-

cello was there in the interests of this area." Defendant's next exhibit is a photograph of the assault in the *States-Item* captioned "CARLOS MARCELLO, Jefferson Parish crime figure, hauls off and punches an unidentified FBI agent at New Orleans International Airport." Marcello's last exhibit in support of his motion for change of venue is an October 1, 1966 statement in the *States-Item* that he had been arraigned on charges stemming "from a punch the Jefferson Parish crime figure threw at FBI agent Patrick J. Collins, Jr. * * *."

12. The magazine article stated that Carlos Marcello was the organized crime kingpin in New Orleans. It also described this particular assault.

13. Counsel for Appellant characterized the Governor's statements:
 "His first statement seemed to be that the present laws could not deal with Mr. Marcello, and this is reported in the *Times-Picayune* for September 12.
 "Then, today, Mr. McKeithen, Governor McKeithen, seems to have said that Mr. Marcello was engaged in legitimate enterprises, but that he would still like to get rid of him out of the state."

But what transpired reflects clearly that the motion as filed and as then presented covered both continuance and change of venue because of inflammatory publicity. In reply to a specific question as to whether his motion was an alternative motion for continuance or a change of venue, counsel for Appellant replied, "The motion incorporated both, but I would be at a loss to suggest to the Court, if the Court were to ask me, where venue should be changed to."

The Government submitted the matter without argument.

The Judge then made it clear that with the motion for both change of venue and continuance immediately before him he would take the wisest tack and rule on the venue portion first since he had to rule on it at some time and "any continuance that might be granted * * * would depend upon the local atmosphere of that particular [transferee] district." His reasoning was that if he did rule that venue should be changed, he should not rule on the other half (the continuance portion) of the motion but rather should leave its disposition (along with the other 10 motions) to the Trial Judge in the transferee district.

There was no objection by Marcello or his counsel to this course of procedure. It was plain as could be that the Judge was going to rule on change of venue first. Again there was acquiescence with no—the word is no—objection.

This became doubly clear from the ensuing colloquy which made it positively evident to all present that on the basis of overwhelming evidence of adverse publicity (see notes 11, 12, 13, *supra*) the Trial Judge felt that Marcello could not get a fair trial in the Eastern District of Louisiana.[14] Before his final determination his purpose was simply but forcibly expressed. "Let me make it clear here that I will grant the motion for change of venue and leave all other motions * * *." Leaving no doubt what his conclusion was and that a change of venue would be ordered, the Court and counsel then discussed whether counsel should submit alternative districts, how many, and within what time they should be submitted. After more discussion concerning potential transferee districts with nary a sound of objection either from Marcello or his counsel, the Court granted defendant's motion for change of venue and determined that all other motions, including the motion for continuance should be transferred.

Although this exposition of fact would seem to be lengthy enough to determine one of the fifteen issues, it is not. A new wrinkle in the form of Mr. Marcello's attorney enters the chambers. Not more than ten minutes after counsel's motion so vigorously pressed had been granted, he appeared in the Judge's chambers and to Judge Heebe's "complete surprise" United States v. Marcello, E.D.La., 1968, 280 F.Supp. 510, 512), requested withdrawal of the just-entered order. The Court asked for a written motion and memorandum, which counsel filed in the form of a "Motion to Reconsider Order Directing Change of Venue" and which was taken under submission after oral argument on September 22, 1967. At the hearing, it was

---

14. The Judge figured that the possibility of Defendant's getting a fair trial would be greater if the change of venue was granted for several reasons. First, and most obviously, the newspaper articles were not circulated extensively or front-pagedly outside Louisiana. Concerning the *Life Magazine* article he realized the fact that it had nationwide circulation and the possibility of its affecting prospective jurors everywhere but concluded that any prejudicial effect would be magnified in Louisiana. Perhaps as an amateur but experience-trained psychologist-philosopher he emphasized that the *Life* article "put its finger on the State of Louisiana. And for that reason I am quite sure that the percentage of the people who read the articles, and who read them with a feverish intensity, were people who live in the State of Louisiana, because this is their state; whereas, maybe people in—well, what state was not mentioned? Montana? or Wyoming? Perhaps they were not quite as interested in it. We read generally what we are interested in, and what reaches us closest at home."

argued that "in view of the fact that we are dealing with a Constitutional right, and in view of the fact that the Defendant desires to assert his Constitutional right to have a trial here, even though there is prejudicial publicity, and in view of the fact that the provisions of change of venue are for the benefit of the Defendant, and since he does not desire to take advantage of it, I submit that this motion for reconsideration should be granted."

We see, as did Judge Heebe in his well written opinion (United States v. Marcello, *supra*) denying the motion, Marcello's contention as dual. He argues (i) that he withdrew his motion for change of venue at the original hearing and (ii) that even if he did not, he did not waive his Constitutional right to be tried in New Orleans.

■ Appellant's idea that he withdrew his motion is just factually incorrect as is clear from the events as set out above. Counsel's statement italicized *supra*, "I am, naturally, withdrawing a request for a change of venue—I beg your pardon—I am not pressing my request for a change of venue at this time" is obviously, shrewdly, and carefully not a withdrawal. Nothing said or done by Court or counsel could have left anyone, including specifically Marcello, in any doubt as to what was being argued and sought. Indeed, the fact that this exceptionally able, articulate advocate caught himself and restated his position is a positive refutation of any purpose to withdraw.

From the Judge's bench we can most clearly see that a determination not to press is not the same as a withdrawal. More than that, as a matter of fact it was not even a case of "not pressing". The running colloquy showed that it was being urged and considered, and at that point it was up to Marcello to advise the Judge that what had been sought and what obviously was being granted was no longer desired. The Judge had a serious duty both under the rules (see note 10, *supra*) and the Constitution. The evidence overwhelmingly proved that Marcello could not get an unprejudiced trial in New Orleans. No Judge worthy of the name could permit that to occur. The Judge could also see that if he did not grant a change of venue the case would begin with built-in grounds for reversal. In the face of this motion and showing by Marcello, Judge Heebe stated and this Court agrees that it would have been utterly absurd to believe that if the motion had been denied and if Defendant had been convicted, a higher Court would then preclude the Defendant from arguing on appeal that the lower court had erred in denying the motion for change of venue on the basis that it had been abandoned.

The Judge was entitled, indeed required, to take Marcello's claim as presented and proved. His duty was to act and having acted it was not for the Defendant to reweigh the strategic or tactical disadvantages of the victory.

■■ The second phase of Defendant's complaint is that even though the original motion may not have been withdrawn, Defendant himself did not knowingly waive his rights.[15] There is no question that these rights may be waived. Yeloushan v. United States, 5 Cir., 1964, 339 F.2d 533. Nor is there any question that the waiver must be voluntary. We find that this record satisfies the essential factors of knowledge of the right, the free exercise of an uncoerced will, and conduct or action known to the accused which evidences an intent to waive.

■ The latter factor is met here by the filing and the affirmative presentation of the motion for change of venue. To persist in this in the face of the exchanges between Judge and counsel was to seek the advantage of a ruling

---

15. Judge Heebe holds, clearly correctly, that the oral granting of a motion for a change of venue completes the determination process on that motion so that the granting is effective even though no written order has been issued.

that would be the very contradiction of a Sixth Amendment right to be tried in a district poisoned by prejudice. This record readily meets the famed standard: "The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." Johnson v. Zerbst, 1938, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461. In assaying this Judge Heebe was warranted in considering Marcello's intelligence, articulateness and the exceptional competence of his three counsel. As the Court well knew, Marcello was no novice to litigation, criminal, civil and administrative, in many of which Constitutional rights were invoked.[16]

In the presence of Marcello, Judge and counsel in the plainest of English words were discussing why trial in the Eastern District of Louisiana would not be fair and where a fair trial might be had. The Court made it plain he was going to transfer the case as a result of the motion made by Defendant and proved by him. The Judge was entitled to find as he did that Marcello's silence was approval of all that was going on. Both through counsel and personally Marcello had made, and was making, the choice to forego trial in a biased locale.[17]

The fact that Defendant did not withdraw his motion and his waiver before the motion was granted does not mean that the Trial Judge could not rescind his order. He clearly has the power to vacate at Defendant's request an order granting a change of venue. Whether or not he should do so is left to his sound discretion. In weighing the competing interests at that juncture, the Judge was nowhere near an abuse of discretion.

Recognizing that Stevens v. Marks, 1966, 383 U.S. 234, 86 S.Ct. 788, 15 L.Ed.2d 724 stands generally for the proposition that a Defendant ought to be allowed to withdraw a prior waiver of a Constitutional right when there is no justification otherwise, there was

---

16. Here is a list of many of the cases to which Carlos Marcello has been a party.

A 1938 conviction on two counts of transferring marihuana in violation of the Marihuana Tax Act of 1937.

Marcello v. United States, 5 Cir., 1952, 196 F.2d 437, reversing a conviction of contempt of the United States Senate.

A 1953 deportation order, appeal, and affirmance by the Board of Immigration Appeals.

United States ex rel. Marcello v. Ahrens, E.D.La., 1953, 113 F.Supp. 22 (habeas corpus proceeding holding deportation order valid), aff'd sub nom. Marcello v. Ahrens, 5 Cir., 1954, 212 F.2d 830, aff'd sub nom. Marcello v. Bonds, 1955, 349 U.S. 302, 75 S.Ct. 757, 99 L.Ed. 1107.

Marcello v. Brownell, 1957, 100 U.S. App.D.C. 346, 245 F.2d 279 (proceeding to deport holding Marcello to be deportable), cert. denied, 355 U.S. 903, 78 S.Ct. 331, 2 L.Ed.2d 260. Marcello v. Kennedy, D.C.D.C., 1961, 194 F.Supp. 748 remitting case to D.C.D.C., 1961, 194 F.Supp. 750 (declaratory judgment proceeding declaring deportation valid, vacated and rem'd, 1962, 114 U.S.App.D.C.

147, 312 F.2d 874, cert. denied, 373 U.S. 933, 83 S.Ct. 1536, 10 L.Ed.2d 692.

United States v. Marcello, E.D.La., 1962, 202 F.Supp. 694, ordering a hearing, E.D.La., 210 F.Supp. 892 (proceeding in nature of coram nobis to set aside original 1938 conviction denying relief), aff'd, 5 Cir., 1964, 328 F.2d 961, cert. denied, 377 U.S. 992, 84 S.Ct. 1916, 12 L.Ed.2d 1045.

Marcello v. CIR, 43 T.C. 927, 43 T.C. 928, aff'd in part, rem'd in part, 5 Cir., 1967, 380 F.2d 499, cert. denied, 389 U.S. 1044, 88 S.Ct. 787, 19 L.Ed.2d 835.

Marcello v. Commissioner of Internal Revenue, 5 Cir., 1969, 414 F.2d 268 (after remand).

17. Quite apart from these factors showing personal acquiesence if not approval by Marcello, his attorney's actions may well have been binding on him as a conscious tactic. Henry v. Mississippi, 1965, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408. As was shown above, this venue maneuvering was clearly a tactic and under *Henry* a conscious waiver for the sake of giving defendant a tactical advantage is generally binding on defendant as an effective waiver.

strong justification here. It would have been impossible for Marcello to receive a fair trial in New Orleans because of the continued and continuing unfavorable publicity. See notes 11, 12, and 13, *supra*. Nor was the Judge required after such a determination to regard it all as just so much a matter of tactics by clever resourceful advocates in what might well be a heads-I-win-tails-you-lose technique.[18]

A federal judge—in no sense a mere moderator—does not perform his awesome role by allowing "rights" to be moved like chessmen.

### 6. Place Of Trial

Appellant's sixth contention is not briefed but is that his second motion for change of venue, after the mistrial in Laredo, should have been granted because of adverse publicity in Laredo, Corpus Christi, San Antonio and Houston. There was clearly no error here because Defendant did not meet the formidable task facing a defendant seeking a change of venue, 4 Barron & Holtzoff, Federal Practice and Procedure, § 2092 (1951 and supp.); 8 Moore, Federal Practice, ¶ 21.03 (2d ed., 1969); Annot., 10 L.Ed.2d 1243, 1272–87 (1964).

### 7. Suppression Of Subpoena

For his seventh attack Appellant urges that the District Court should not have suppressed the subpoena duces tecum (F.R.Crim.P. 17(c))[19] served upon the Attorney General and calling for the production of the September 30,

1966 surveillance records and the personnel records of Collins.

He complains of suppression because he says the credibility of Collins, the complaining and key government witness, was sharply in issue. His contention might be somewhat better except for the fact that the Trial Judge did not suppress the subpoena as to Jencks Act[20] material. In fact, the Trial Judge was even more liberal than the Jencks Act requires—he directed the Government to allow Marcello's attorneys to peruse the statements before his trial began rather than, as is required by the Act, after the witness had testified at trial.

 The Trial Judge did quash other portions of the subpoena and rightly so since forcing the government to bring these records to trial would have been unreasonable. The Appellant was clearly attempting to use Rule 17(c) as a discovery device, which it is not. Bowman Dairy Co. v. United States, 1951, 341 U.S. 214, 220, 71 S.Ct. 675, 679, 95 L.Ed. 879, 885; Gilmore v. United States, 5 Cir., 1958, 256 F.2d 565, 567. See 1 C. Wright, Federal Practice and Procedure, § 274 (1969).

### 8. Mafia References

Appellant's eighth claim in this inexhaustible opus is that the District Court should have declared a mistrial when the prosecution "improperly injected" Cosa Nostra and Mafia references into the trial. This contention fails because it is essentially a mis-

---

18. This had the marks of a preplanned attack. It was clear to the Judge, as it is to us, that if Defendant's motion for change of venue were denied and he had been convicted, then his conviction could easily be reversed on appeal and if the motion were granted, then he could use the procedure he is presently using.

19. F.R.Crim.P. 17(c) provides:
 "(c) *For Production of Documentary Evidence and of Objects.* A subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein. The court on motion

made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive. The court may direct that books, papers, documents or objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, papers, documents or objects or portions thereof to be inspected by the parties and their attorneys."
 F.R.Crim.P. 17(c).

20. 18 U.S.C.A. § 3500.

statement of fact. The prosecution did not inject anything into the trial. Rather the defense was the one who allowed the potion to be administered.

Here is how it happened. Collins was on the stand. Defense counsel was working on him after a relatively innocuous (as far as the Mafia medicine is concerned) examination. While questioning Collins, he—defense counsel—brought up for the first time the name of Michael Maroun, who was originally an attorney for Marcello in this action. He questioned Collins about two meetings with Maroun: one in the fall of 1967, in New Orleans at Lucky Pierre's Bar, and the other in Shreveport at the Town and Country Motel on February 12, 1968.[21]

When defense counsel had finished, the prosecution's chief surgeon returned with what defense counsel saw as an enormous hypodermic needle to inject toxic references into the whole operation. But this misconceives the prosecution's action. Like most questioning in response to tactics or testimony given on examination by the adversary, when it comes to the opponent's turn, the medicine may well turn out to be strong. But if it is, it may yet be a fitting antidote. Here is what actually occurred on redirect:

"Q. Now, you were asked about a meeting with Mike Maroun at Lucky Pierre's in November of 1967 in New Orleans?

A. Yes, sir.

Q. Who is Mike Maroun, Mr. Collins? Do you know?

\* \* \* \* \* \*

A. Long-time business associate of Carlos Marcello. Close personal confidante, nightclub manager, does an act and he's a lawyer, also.

\* \* \* \* \* \*

Q. Now, without going into the details, Mr. Collins, of the conversation, we want you to tell the court and the jury the general subject matter of the conversation as it occurred during this particular night at Lucky Pierre's. Just the subject matter, not all the details.

\* \* \* \* \* \*

A. The main subject which took up well over half the time was Maroun's repeated statements to me about, 'we know which of our phones we have tapped. We know which of our rooms you have wired.' And he kept going on like that.

\* \* \* \* \* \*

Q. Again with the same limitations as we had to the Lucky Pierre conversation, what were the subject matters and the discussion that night [at the Town and Country Motel]?

A. Again, the big thing he spoke of was wire tapping, listening in and we did discuss La Cosa Nostra, the American Mafia."

21. We set out testimony pertaining to these two conversations verbatim.

Conversation at Lucky Pierre's Bar

"Q. Do you [Collins] recall having any conversation with him [Maroun] there?
A. Yes, sir. 15 or 20 minutes.
Q. Do you recall discussing this case with him?
A. No, sir. I did not.
Q. You had no discussion about this case with him at Lucky Pierre's?
A. No, sir.
Q. You don't recall telling him at Lucky Pierre's that this entire incident was an accident?

A. No, sir.
Q. You definitely did not make that statement?
A. No, sir."

Conversation at Town and Country Motel

"Q. Did you [Collins] have any conversation with him [Maroun] about this case on that occasion?
A. No, sir, not about this case.
Q. You did not discuss this case at all with him?
A. No, sir."

At this stage the jury was removed and Appellant moved for a mistrial, which the Trial Judge refused, but he did instruct the jury to disregard the statement.[22]

The arguments of both sides are simple. Appellant argues that the statement was so prejudicial no limiting instruction could possibly have cured it. The Government argues that Appellant's counsel was the one who sowed the seeds of the whole conversations and what he sowed that shall he also reap including any prejudicial effects flowing from the interrogation and response, whether initially or in elaboration on redirect examination.

■ Defense counsel presumably thought it helpful to show through Collins that Maroun and Collins had discussed the assault and that Collins had mentioned to Maroun several things detrimental to the Government's case. Since the Government could then anticipate that at some stage Maroun would —as he later did (see contention 9, *infra*)—testify to his version of the conversation, the Government had every right to rebut this idea and at the same time bolster the credibility of Collins. In view of the fact that Collins did have a conversation with Maroun and did talk about something, an entirely proper area of inquiry was the subject matter of the conversations. That called for testimony on who said what he said or said was said.

Additionally, there is nothing here to indicate that in the course of this legitimate interrogation the Government counsel was seeking to bring out "Cosa Nostra" or that it would even be mentioned. More than that, from the conversation the connection between Marcello and the Mafia was verbally non-existent, and by implication only the very slightest. Indeed, on Collins' version Maroun was talking about the Mafia, not who the members or associates were.

The testimony, spontaneously volunteered by the witness, was relevant to a subject first broached by Appellant, the connection between him and the utterance was weak, the prejudice to him, if any, was slight, and the jury was properly instructed in a manner which did not cast a spotlight on the statement itself (see note 22, *supra*). In this light the instruction was sufficient and a declaration of mistrial was not appropriate, much less mandatory.

### 9. Grab Bag of Prosecutorial Misconduct

■ Appellant's ninth contention is hexagonal and deals with several acts of the prosecution both before and during trial. Three of these can be dealt with in short fashion. Appellant first complains of allegedly prejudicial announcements made by a Justice Department coordinator to the New Orleans press on September 29, 1966 (see note, 11, *supra*). These statements were made prior to the alleged violation here, have nothing to do with this case, and thus do not call for reversal. Appellant's second complaint is that at pretrial argument Government attorneys misrepresented that certain evidence was not in their possession. Appellant does not document this complaint and points to no injury from a misrepresentation if in fact one occurred. Appellant's third complaint—the Government failed to allow him to inspect an exhibit in conformity with a discovery order—is unfounded because the order was conditioned upon Defendant's making a similar tender, which he apparently did not do.

Appellant's fourth subpoint is that mistrial should have been declared because the prosecuting attorney in his closing argument supposedly cast aspersions on defense counsel and accused two defense witnesses of lying. The testimony and statements are obviously important here. At the first trial (which

---

**22.** He said: "Do not consider it for any purpose. Forget it. Don't talk about it. Don't let it enter into your discussions."

ended in a hung jury in Laredo) Michael Maroun testified that he had met with agent Collins at the Town and Country Motel on February 5 (see text and note 21, *supra*) and that the next day he had dictated a memorandum dated February 6 to the effect that Collins told him that he was not put in fear on the night of the alleged assault, was not injured and that Marcello would clearly win his case either at the trial or appellate level. At the second trial it came out that the meeting was really on February 12 and not on the 5th. Maroun attempted to explain the discrepancy between fact and his memorandum by stating that his secretary had misdated the memorandum.

These facts were brought out on the second trial and not unnaturally capitalized upon by the prosecution in closing jury argument.[23] The defense objected on the ground that the prosecuting attorney had deliberately made an accusation against defense counsel. The Trial Judge stated that he did not so construe the argument, and as it said nothing about the Defendant he overruled the objection.

Another prosecution jury argument complained of was aimed at defense witness Katherine Angel's testimony that she had noted the date February 12 on her calendar as the night she met Collins. The prosecuting attorney mentioned her calendar and this notation in a light the defense found objectionable. He stated that "God only knows when she went back and inserted the date of February 12," and referred to the memorandum as the "skunk in this case".

Defendant also complains of arguments to the effect that defense counsel were not being fair in their presentation of evidence, that Mr. Maroun was not telling the truth, that others were not telling the truth, and that for this reason the whole defense was an insult to the jury's intelligence.

Appellant presents three reasons why the closing jury argument was highly improper: First, because it charged the defense and defense witnesses with fabrication of evidence, second, because the prosecution commented on a memorandum which was not in evidence (Maroun's memo dated February 6), and third, because the prosecutors expressed their personal opinion.

As to Appellant's first reason, the prosecution could legitimately attempt to persuade the jury that there were facts tending to support the conclusion that Maroun and Angel were not telling the truth in relating what Collins said (see note 21, and related text, *supra*) and that on the contrary Collins was telling the truth in his denial of any such statements. In this swearing match over what Collins said he said or what others said Collins said, much emphasis was focused on the disparity of time—whether the conversation was on February 5 or 12—and the memorandum which, offered as proof positive of the meeting, itself turned out to be in error.

This memorandum, its existence and accuracy ties into and refutes Appellant's contention that the prosecution improperly commented on a memorandum which was not in evidence. Of course, there is no question that "It is improper for counsel to express his personal opinion or to state facts of his own knowledge, not in evidence, and not part of the evidence to be presented; or to make unwarranted inferences or insinuations calculated to prejudice the defendant." Dunn v. United States, 5 Cir., 1962, 307 F.2d 883, 886 quoting from Taliaferro v. United States, 9 Cir., 1931, 47 F.2d 699. But the fact of the matter here is that the prosecutor's comment was not aimed at the memorandum itself but rather was

---

23. "So they have a memorandum dated February the 6th. Six days prior to the event saying what Collins is alleged to have said, and the meeting had never taken place. Now, this is unbelievable. And what happened, ladies and gentle- men? When it came time for Mr. Maroun to testify on the prior occasion, the defense decided that they needed some kind of memorandum to impeach Agent Collins so they made up this phony memorandum."

aimed at testimony concerning the memorandum. This testimony was a matter of record, was given in the first trial, and had been referred to in the second trial. Thus the prosecution's argument was not aimed at a fact not in evidence and was proper.

■ As to Appellant's last subcontention, we know from *Dunn, supra* that "It is improper for counsel to express his personal opinion * * *." In this case we do not regard the prosecution as expressing its personal opinion. Rather these were legitimate forensic arguments pointing out to the jury why, to the minds of the reasonable persons jurors are supposed to be, the contentions of the Defendant could not pass muster, were arguments which could not prevail, and hence were claims which were not fair since they could not fairly be credited by fair, disinterested jurors. The upshot is that none of the arguments in the face of hotly contested issues of fact were improper, and certainly none were prejudicial.

### 10.　Knowledge as an Element

■ Appellant's tenth contention is that the District Court erred in not instructing the jury that knowledge of the status of Collins was an element of the offense of assault and intimidation of an FBI agent under 18 U.S.C.A. § 111.[24]

---

24.　See note 1, *supra.*

25.　See note 1, *supra.*

26.　The Court charged:
"The word 'assault,' as used in the indictment and in this charge, means any intentional and unlawful threat or attempt to commit injury upon the person of another, when coupled with an apparent present ability so to do, and an intentional display of force such as to place the victim in reasonable apprehension of immediate bodily harm, constitutes an assault. An assault may be committed without actually touching, striking, or committing bodily harm to another.
"The word 'forcibly,' as used in the indictment and in this charge, means simply the use on the part of Carlos Marcello of force upon or toward Patrick J. Collins, Jr.

Bennett v. United States, 5 Cir., 1960, 285 F.2d 567, cert. denied, 1961, 366 U.S. 911, 81 S.Ct. 1087, 6 L.Ed.2d 236, which is still very vital, see Burke v. United States, 5 Cir., 1968, 400 F.2d 866, cert. denied, 1969, 395 U.S. 919, 89 S.Ct. 1771, 23 L.Ed.2d 237; Pipes v. United States, 5 Cir., 1968, 399 F.2d 471, cert. denied, 1969, 394 U.S. 934, 89 S.Ct. 1207, 22 L.Ed.2d 464, clearly holds that "scienter is not required either in the indictment or in the proof to sustain a Section 111 conviction." *Pipes, supra* at 472 of 399 F.2d. See also United States v. Wallace, 4 Cir., 1966, 368 F.2d 537, 1967, cert. denied, 386 U.S. 976, 87 S.Ct. 1169, 18 L.Ed.2d 136; United States v. Lombardozzi, 2 Cir., 1964, 335 F.2d 414, 10 A.L.R.3d 826, cert. denied, 379 U.S. 914, 85 S.Ct. 261, 13 L.Ed.2d 185.

### 11.　Willful Intent To Injure

In his eleventh argument Appellant contends that the Court erred in refusing to charge that the offense of forcible assault[25] required a willful attempt and intent to inflict violent or serious injury. The Court charged that the word " 'assault' * * * means any intentional and unlawful threat or attempt to commit injury * * *."[26] He then defined "forcibly" as "the use of force."

Defendant contends that the Trial Judge should have included as inherent

"The word 'intimidate,' as used in the indictment and in this charge means simply to make timid or fearful or to inspire or affect one with fear.
"In connection with the word 'forcibly' and the word 'intimidate,' it is not necessary that Patrick J. Collins, Jr., believed that any bodily injury he might sustain would be great or severe. For instance, attempting to strike a person with an open hand might constitute an assault, although that person knows that a blow by the open hand is not normally calculated to cause any serious bodily injury. Therefore, it is sufficient if the attempt to use force causes a person such as Patrick J. Collins, Jr. to reasonably believe that some injury might be inflicted although such injury might not be severe."

cognition

in his definition of assault the idea of violence so that the crime charged would amount to a *"forcible and violent* threat or attempt to commit injury" or a *"forcible* threat or attempt to commit a *violent* injury." Each of the words, "force" and "violence," when used alone in conjunction with "assault" conjures up the same idea and means the same thing.[27] Thus to include the idea of violence in the definition of assault would make the phrase "to forcibly assault" a tautology.

When the idea of violence is used as an adjective for "injury", it still does not necessarily connote a serious injury—it merely means an injury by violent or forceful means. Thus the use of the word "violent" in describing a potential injury resulting from a forcible assault is also redundant. The authority Appellant cites for the proposition that § 111 requires an attempt and intent to commit a serious injury hold only that the attempt must be accompanied by a degree of force or violence, not that the resulting or intended injury must be serious.

### 12. Entrapment

Appellant's next contention is that the Court should have submitted the issue of entrapment to the jury. There is no question that the issue of entrapment does not have to be submitted, but rather can be found as a matter of law, if it is obvious that the substantive factors of the defense are all present. Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848. See Lathem v. United States, 5 Cir., 1958, 259 F.2d 393, 396; Suarez v. United States, 5 Cir., 1962, 309 F.2d 709. The converse is also a maxim of criminal law —that when the evidence does not raise entrapment, the issue should not be submitted. Brainin v. United States, 5 Cir., 1963, 314 F.2d 460; United States v. Alford, 2 Cir., 1967, 373 F.2d 508, cert. denied, 387 U.S. 937, 87 S.Ct. 2062, 18

L.Ed.2d 1003; United States v. Gosser, 6 Cir., 1964, 339 F.2d 102, cert. denied, 1965, 382 U.S. 819, 86 S.Ct. 44, 15 L.Ed. 2d 66; cf. Brooke v. United States, 1967, 128 U.S.App.D.C. 19, 385 F.2d 279.

The elements of the entrapment are well known. Sorrells v. United States, 1932, 287 U.S. 435, 442, 53 S.Ct. 210, 213, 77 L.Ed. 413, 417; Sherman v. United States, *supra*, 356 U.S. at 372, 78 S.Ct. at 820, 2 L.Ed.2d at 851.

In the instant case there is no evidence tending to show any of these elements of the defense. The evidence shows that Marcello had begun his angry charge at the group of reporters before Collins arrived. This certainly shows that his design and disposition to commit the offense were present before Collins' arrival and thus could not have originated with or been induced by a government official. After Collins' arrival it is true that his presence and refusal to back down when Marcello asked "Are you looking for trouble?" afforded opportunity to commit the offense, but this does not constitute implantation of the disposition to commit in the mind of an innocent man, or inducement for the purpose of prosecuting. *Sorrells* and *Sherman, supra.*

The Trial Judge was eminently correct in not submitting the issue of entrapment.

### 13. Election

Appellant's thirteenth contention is that the Trial Court should have granted his motion to require the Government to elect between the issues of assault and intimidation. His contention is based on the idea that "assault" and "intimidation" mean the same thing and constitute the same offense and therefore only one should have been submitted. The contention is groundless because the statute prescribes two different offenses. See Black's Law Dictionary 4th ed. One might be guilty of one or the other or both.

---

27. Webster's New International Dictionary (2d ed.) defines violence in terms of force: "Power, violence, compulsion, or constraint exerted upon a person or thing."

### 14. Motions

Appellant's fourteenth contention is that, since the case was submitted in the alternative on the issues of forcible intimidation and forcible assault, and since neither substantial evidence nor evidence more consistent with guilt than with innocence existed, his motion for acquittal and motion for arrest of judgment and a new trial should have been granted.

 The question of whether Marcello actually committed the act that he was accused of committing is a question for a well-instructed jury if the evidence is substantial enough to establish a case from which the jury may infer guilt beyond a reasonable doubt. McFarland v. United States, 5 Cir., 1960, 273 F.2d 417, 419. In determining whether the evidence is sufficient, it must be viewed in the light most favorable to the Government, Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680, and all inferences that may reasonably be drawn from the facts must be considered. United States v. Auerbach, 5 Cir., 1969, 420 F.2d 921, 924 [Dec. 9, 1969]; Peters v. United States, 5 Cir., 1967, 376 F.2d 839. Without further lengthening an already lengthy opinion by setting out all the evidence we view as supporting the Government's case, we hold that there is more than ample evidence from which the jury could find that Collins was either forcibly assaulted, intimidated, or both.[28] The punch in the face was a forcible assault (see contention No. 11, *supra*). And since this more than put Collins in fear of being struck, it constituted forcible intimidation as well.

### 15. Sentence

Marcello's last contention is that the District Court should not have utilized "brushes with the law" in imposing sentence in this case.[29]

 There is no question that the Trial Judge in determining sentence can go outside the record and consider Defendant's past conduct and activities. Williams v. New York, 1949, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337. Defendant does not seem to quibble with this statement of the law. What he does quibble with is the type of outside information used. Appellant pinpoints as error the Judge's verbally taking into account two Court proceedings which he ultimately won. But the Judge's oral summation of the presentence report, which he obviously had considered and which the rules call for (F.R.Crim.P. 32 (c)), reflected that there was at least one instance, if not more, in which Appellant was finally convicted of criminal offenses. There was nothing to indicate that the Judge was retrospectively punishing him for having successfully invoked Constitutional rights. A Judge is by no means confined to a history of criminal convictions. The activities of the Defendant, including his relation to public and police authorities, his position in the community and other factors bear upon his life and lead the sentencing Judge to a balance on (i) punishment, (ii) deterrence and (iii) rehabilitation.

### Windup

Having found each of the fifteen attacks wanting, the conviction must stand.

Affirmed.

### ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

#### PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.

---

28. Marcello's objections to the sufficiency of the evidence also involve the correctness of the Court's charge and the definitions of "assault," "intimidate" and "forcibly". We have already discussed this area and held against Marcello (see contention No. 11, *supra*).

29. The sentence imposed was two years and a $5,000 fine out of a maximum 3 years and $5,000 fine.