**UNITED STATES of America, Plaintiff,**

v.

**Willie C. GRUBBS and Sule Jackson, Defendant.**

**No. 96–351–CR.**

United States District Court, S.D. Florida.

Jan. 27, 1997.

---

Robert Waters, Asst. U.S. Attorney, Office of United States Attorney, Miami, FL, for plaintiff.

Fletcher Peacock and Tim Day, Asst. Federal Public Defenders, Office of Federal Public Defender, Miami, FL, for defendants.

ROETTGER, Chief Judge.

This 18 U.S.C. § 111 case presents an unusual—although not completely unique—fact situation in urban America.

The Grand Jury returned an indictment against only two persons out of a group estimated at six to ten young men who were riding the Miami "People Mover", an elevated railway which circles the center of the city. The victim in this case was an Assistant United States Attorney who was coming out of the United States Attorney's Office, the largest office of any of the districts in America. In the complex of Miami federal courthouses, this United States Attorney's Office is located in the Federal Justice Building which also houses six district courtrooms and a Court of Appeals' courtroom in the same building.

The Assistant United States Attorney (hereafter AUSA) is an experienced prosecutor with nine-and-a-half years service in the U.S. Attorney's Office; she was the duty officer for the district for that particular weekend and was leaving the office around 6:30 on a Friday evening, which happened to be Good Friday, April 5, 1996. She had a number of files with her to work on over the weekend and her duty status began as of April 5th. The train station for the "People Mover" train is located at the north edge of the same block that the building[1] which

houses the United States Attorney's Office occupies, fewer than one hundred yards from the night exit door. Next door is the Federal Detention Center, which houses fourteen hundred persons in custody awaiting trial, sentencing or to testify.

The AUSA was standing on the platform as the train—in this case, one or two cars—stopped. A number of young men got off the car and one of them "grabbed her rear end". When that happened, the AUSA testified she screamed, "You asshole!" The dialogue quickly entered the less than lofty vernacular with a response from one of the men in the group: "Who are you callin' asshole, bitch?" The AUSA: "Whoever grabbed my ass." Obscenities and loud, angry voices quickly dominated the situation, with perhaps the loudest voice being that of defendant Jackson. The AUSA concluded that it was time to get herself out of that situation and into the train and moved forward to board the train. At that moment defendant Grubbs, according to the AUSA's testimony, gave her a "karate kick" propelling her into the car. She testified that she "would have fallen except I grabbed a pole (stanchion) in the car". To flesh out the situation, defendant Jackson had a slingshot and defendant Grubbs had a rubber snake, which he threw into the car before the doors closed. Testimony of an eye-witness in the train basically substantiated the AUSA's testimony except as to the "karate kick" nature of the kick. The spectator, on cross-examination, stated emphatically that it was not a push, but it was a kick. The same passenger on the train corroborated that the AUSA stumbled after the kick but did not fall.

Fortunately, the AUSA suffered no permanent injuries, which would have implicated the enhanced penalty provided under 18 U.S.C. § 111(b).

Apparently, there was discussion aboard the train about whether the AUSA should report the incident to the police and she did so. The Metro–Dade police officer took a statement from her and she then identified Defendant Grubbs at the police station.

---

1. Now officially named the James Lawrence King Building.

At the close of the government's case defendants moved for a judgment of acquittal under Rule 29. The court granted defendant Jackson's motion because the extent of the evidence against Mr. Jackson was simply that he was louder than anyone else in the group. Mere words do not constitute an assault[2] and there is no evidence in the government's case from which one could infer a touching and intimidation or impeding or obstructing of the AUSA by Mr. Jackson.

The motion for judgment of acquittal by Mr. Grubbs compelled different considerations. He was the person who kicked her into the train and the government admittedly had no evidence as to which one made the initial pinch or grab of the AUSA's rear-end. The statute, as amended in 1994, reads as follows:

> "Whoever ... forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in Section 1114 of this title while engaged in or on account of the performance of official duties ... shall, where the acts in violation of this Section constitute only simple assault, be fined under this title, or imprisoned not more than one year, or both, and in all other cases, be fined under this title or imprisoned not more than three years, or both."

This court cannot help but observe that this case seems to have become one that has emotionally involved both the United States Attorney's Office and the Federal Public Defender's Office for reasons unknown to this court. Perhaps it is the tortured history of the case in the sense that the United States Attorney's Office sought pre-trial detention against Mr. Grubbs and was successful before the magistrate judge in obtaining it. After a few weeks this court released Mr. Grubbs on bond; the Federal Public Defender's Office sought to enter a plea of guilty but only to a misdemeanor. However, the government insisted the conduct was felonious in nature within the meaning of the statute. Then, surprisingly, the parties worked out a request for pre-trial diversion, which Mr. Grubbs managed to violate within two weeks. The dispute whether the conduct was felonious in nature or merely a misdemeanor continued to prevent the parties from resolving the matter by plea; hence, this trial.

Defendant Grubbs' main thrust to the jury in closing argument was that the AUSA was not on official duty after she had left the building Friday evening. There was government evidence, as well as evidence by defendant to the contrary, that the AUSA was on official duty the entire weekend merely because she was the duty assistant that weekend. Additionally, in view of the fact the law is fairly clear that going to work brings one within the scope of "performance of official duties" of persons enumerated in 18 U.S.C. § 1114[3] it seems clear to this court that going from one's duty station to one's home should also be within the ambit of the statute and so instructed the jury.[4] There was no evidence of any intended deviation from her proposed commute home.

The court received emphatic notes from the jury advising of a deadlocked jury and after a day-and-a-half's deliberation following the brief trial, the court declared a mis-trial.[5]

2. *Blackwell v. State*, 69 Fla. 453, 68 So. 479 (1915).

3. *U.S. v. Stephenson*, 708 F.2d 580 (11th Cir. 1983); also, *U.S. v. Clemons*, 32 F.3d 1504, 1508 (11th Cir., 1994), *cert. denied*, — U.S. —, 115 S.Ct. 1801, 131 L.Ed.2d 728 (1995).

4. The specific language of the instruction on this particular issue is as follows:

"Under Title 18 U.S.C. Section 1114 you may find that a victim was "engaged in ... the performance of ... official duties, if you find that, at the time of the alleged assault, the victim was acting within the general scope of what she was employed to do or what she was expected to do as part of that employment, or going to or from her workplace and her home."

5. Apparently, the jury was deadlocked 7–5 for guilty with the issue in the jury room being whether the AUSA was on official duty.

Although it is perhaps pure speculation, a trial judge cannot help but wonder if the problem the jury was having with the evidence in this case was because there is no evidence that defendants had the slightest reason to believe that the victim was, in fact, an AUSA going home from work; and had perhaps less reason to believe she was the duty officer for the United States Attorney's Office that weekend. Under those circumstances a citizen could well wonder why Federal officers

Judgment of acquittal was entered for defendant Jackson and judgment of acquittal as to the felonious sections of 18 U.S.C. § 111 was entered for defendant Grubbs. However, the motion for judgment of acquittal as to the misdemeanor part of the statute for simple assault was denied.

would be entitled to Federal court protection in assault and battery situations more than the ordinary citizen would receive in such situations. For ordinary citizens the prosecution, if any, would be in state court and defense counsel made this argument to the jury as well.

It is unquestioned that the defendant who commits battery on a Federal officer does not have to know of the victim's Federal status. *U.S. v. Feola*, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975); *U.S. v. Stephenson*, 708 F.2d 580 (11th Cir.1983); *U.S. v. Marcello*, 423 F.2d 993 (5th Cir.1970), *cert. denied*, 398 U.S. 959, 90 S.Ct. 2172, 26 L.Ed.2d 543 (1970). With that state of the law the Congress did not include a requirement of knowledge by defendant of victim's Federal status in order to invoke Federal jurisdiction and protection when it amended § 111 in 1994. Consequently, one must presume the Congress is satisfied with the state of the law as it is now.

A cautionary instruction on this state of the law may be appropriate.